**ALABAMA AIR POLLUTION CONTROL COMMISSION and the State of Alabama, etc., Plaintiffs-Appellants,**

v.

**REPUBLIC STEEL CORPORATION, a corporation, Defendant-Appellee.**

No. 80–7328.

United States Court of Appeals,
Fifth Circuit.
Unit B

May 29, 1981.

Benjamin Cohen, David A. Ludder, Darvin E. Morris, Asst. Attys. Gen., Montgomery, Ala., for plaintiffs-appellants.

Thomas, Taliaferro, Forman, Burr & Murray, J. Ross Forman, III, Birmingham, Ala., for defendant-appellee.

Before TJOFLAT, HATCHETT and THOMAS A. CLARK, Circuit Judges.

HATCHETT, Circuit Judge:

In this appeal, the Alabama Air Pollution Control Commission (Commission) urges us to: (1) reverse a finding by the trial court that steel-making constitutes three separate and distinct processes within the meaning of section 1.2.1 of the Commission's rules and regulations, and (2) impose sanctions on Republic Steel Corp. (Republic Steel). Partially agreeing with the Commission, we hold that steel-making constitutes one process within the meaning of section 1.2.1, and sanctions are not warranted in this case.

## FACTS

In 1973, the Commission granted Republic Steel a permit to operate tandem basic oxygen process furnaces (BOFs) located at its Gadsden Works in Etowah County, Alabama. A BOF is a large pear-shaped, refactory-lined vessel with an open top (the mouth), supported by two truncheons on bearings so that the vessel can be rotated in two directions. The BOF is the facility where iron and scrap metal are converted into steel.

The steel-making process is performed in three phases. First, workers place scrap metal and molten iron in the BOF. This phase is called "charging." During the time the BOF is charged, workers rotate the mouth of the vessel approximately thirty degrees from the vertical position. After completion of the "charge," workers rotate the BOF vessel to a vertical position and place a lance into it through which high-purity, high pressure oxygen is injected into the mix of materials. This phase of steel-making is referred to as "blow." During the "blow" phase of the steel-making process, the vigorous oxidation process creates a heavy reddish-brown plume of iron oxide, other metal oxides, and carbon monoxide. When the temperature of the BOF vessel's contents reach specifications, the vessel is then rotated in the opposite direction and the molten steel is poured out into a ladle. This phase is called "tapping."

When Republic Steel installed its BOF's, it also installed pollution control equipment to capture and control emissions from the BOFs. The control system, which consists of a large hood, is located directly above each BOF vessel. Thus, when the BOF vessels are in a vertical position their mouths are directly below the hoods. Each hood is drafted by a fan which pulls the waste gas through a conditioning chamber to an electrostatic precipitator which removes a large percentage of the particulates from the waste gas. The waste gas is then ducted to the BOF stack where it is emitted into the atmosphere. Because both control systems are located directly above each BOF vessel, they only capture and control emissions generated during the blow phase of the steel-making process since the mouths of the BOF vessels are directly below the hoods during this process.

In accordance with the requirements of the Federal Clean Air Act, as amended, 42 U.S.C. §§ 7401–7642, the State of Alabama, acting through the Alabama Pollution Control Commission (Commission), adopted an air pollution control implementation plan in 1972. On May 17–21, 1976, the Commission sought to determine whether Republic Steel was in compliance with section 4.4.1 of the Alabama Air Pollution Control Commission's rules and regulations.[1]

The test employed by the Commission (called a stack test) consists of a series of three runs. The average particulate mass emission rate for the three runs equaled 25.08 lbs./hr., within the allowable emission rate set out in section 4.4.1 of the Commission's rules and regulations.[2]

As noted above, the control systems used to capture particulate emissions from the

---

1. Section 4.4.1 of the Alabama Air Pollution Control Commission's rules and regulations provides:

    No person shall cause or permit the emission of particulate matter in any one hour from any source in a Class 1 county in excess of the amount shown in Table 4–2 for the process weight per hour allocated to such source. For sources in Class 1 counties, interpolation of the data in Table 4–2 for the process weight per hour values up to 60,000 lbs/hr shall be accomplished by use of the equation:
    $$E = 3.59 \ p^{0.62} \ p < 30 \text{ tons/hr}$$
    and interpolation and exterpolation of the data for process weight per hour values equal

to or in excess of 60,000 lbs/hr shall be accomplished by use of the equation:
$$E = 17.31 \ p^{0.16} \ p \geq 30 \text{ tons/hr}$$
where  E = Emissions in pounds per hour
P = Process weight per hour in tons per hour.

2. The results of the May, 1976, stack test may be categorized as follows:

May 20–21, 1976 Stack Test

| Runs | Emission Rate (lbs./hr.) | Approx. Allowable Emission Rate (lbs./hr.) |
|------|--------------------------|---------------------------------------------|
| 1 | 30.09 | 43 |
| 2 | 35.26 | 43 |
| 3 | 24.99 | 43 |

BOFs during the blow phase of the steel-making process are unable to capture and control emissions generated during the charging and tapping phases. Since the mouths of the BOFs are rotated away from the hoods during these phases, it is impossible to capture all emissions. Thus, the emissions generated during the charging and tapping phases rise to the top of the building housing the BOFs and escape into the atmosphere through a monovent (a duct which ventilates the building through use of the natural drafts within the structure) in Republic Steel's plant. These emissions are considered to be fugitive emissions and uncontrollable. They were, therefore, not subject to the stack test conducted by the Commission in May, 1976.

Shortly after the May, 1976 tests, Republic Steel began experimenting with equipment which would capture emissions during the charging and tapping phases of the steel-making process. The equipment, called a Gaw plate, consisted of metal sheets which operated to direct particulate emissions generated during the charging and tapping phases to the hoods of the pollution control equipment. After the experimental phase, Republic Steel incorporated the Gaw plate into its pollution control system. As a result, Republic Steel's pollution control system controlled and captured particulate emissions resulting from the charging, blow, and tapping phases of the steel-making process.

In May, 1978, the Commission ordered Republic Steel to conduct further tests to determine whether it was in compliance with section 4.4.1 of the Commission's rules and regulations. The test, conducted in May, 1978, consisted of a series of three runs which included particulate emissions created during the charge, blow, and tapping phases. The results of the stack test indicated an average emission rate of 49.71 lbs./hr., or an average of 7.02 lbs./hr. in excess of the maximum allowable emissions for such a process under section 4.4.1.[3]

Shortly after the 1978 tests, the Commission notified Republic Steel that it was not in compliance with section 4.4.1. Thereafter, Republic Steel initiated an investigation to determine if the performance of the BOF electrostatic precipitator could be improved so as to comply with the Commission's interpretation of section 4.4.1. To this end, Republic Steel hired an independent consultant to inspect and recommend ways to improve the performance of the electrostatic precipitator. The improvements recommended by the independent consultant were incorporated into Republic Steel's electrostatic precipitator prior to a third series of tests conducted in May, 1979.

In the interim, however, the Commission instituted this action against Republic Steel for violations of the particulate emission limitations set out in Chapter 4 of the Alabama Air Pollution Control Commission rules and regulations. The Commission sought a civil penalty in the amount of $10,000 for each and every violation of section 4.4.1 and an additional $10,000 a day for each and every day that such violations continued. The Commission also sought injunctive relief.

In May, 1979, workers performed another stack test consisting of three separate runs. The procedure tested particulate emissions created during the charging, blow, and tapping phases of the steel-making process. The tests indicated that Republic Steel's electrostatic precipitator demonstrated an average particulate emission rate of 24.48 lbs./hr., which was within the allowable

3. The results of the May, 1978 stack test may be categorized as follows:

May 25–26, 1978 Stack Test

| Runs | Emission Rate (lbs./hr.) | Allowable Emission Rate Under the Commission's Interpretation (lbs./hr.) |
|---|---|---|
| 1 | 42.56 | 42.84 |
| 2 | 54.18 | 42.59 |
| 3 | 52.38 | 42.63 |
| Avg. | 49.71 | 42.69 |

rate set forth in section 4.4.1 of the Commission's rules and regulations.[4]

### TRIAL COURT DECISION

Republic Steel argued in the trial court that the emissions created during the steel-making process in 1978 fell within the allowable emissions permitted by section 4.4.-1. It explained that under section 1.2.1[5] of the Commission's rules and regulations, the steel-making process is defined as three separate and independent processes: charging, blow or oxygen injection, and tapping. Republic Steel asserted that if the Commission had tested each phase of the steel-making process as a separate and independent process, the test results would have indicated that the emissions created during said processes were within allowable emissions under section 4.4.1.

The Commission agreed that if under section 1.2.1, the definition of the word process should be interpreted to make the steel-making procedure three separate and independent processes, the emissions generated by Republic Steel in 1978 would have complied with section 4.4.1. It argued, however, that the steel-making procedure constitutes one process under section 1.2.1. As such, the Commission concluded that its stack test properly considered the emissions generated during the charging, blow, and tapping phases of the steel-making process in 1978.

The trial court agreed with Republic Steel's interpretation of the term process as defined by section 1.2.1. It found that the emissions generated during each phase of the steel-making process, considered separately, were within the allowable emissions permitted by section 4.4.1. The trial court therefore found that the Commission failed to carry the burden of proof required to show that Republic Steel was not in compliance with section 4.4.1 during the May, 1978 test.

As an alternative ground for its decision, the trial court stated that it was "impressed by the attitude of the defendant company in continuously trying to improve the level of emissions." The court found "especially significant the results of the May, 1979 test and the fact that one of the test runs in 1978 was good." Considering the imposition of sanctions within the sound discretion of the court, the trial court, based upon the above considerations, chose not to impose sanctions in the case.

### ISSUES

The issues to be decided on this appeal are: (1) whether the trial court erred in interpreting the definition of the word "process" in section 1.2.1 of the Commission's rules and regulations as requiring a finding that Republic Steel's steel-making procedure constitutes three distinct processes rather than a single process as urged by the Commission; and (2) whether the trial court erred in failing to impose penalties and injunctive relief.

### I

■ Before considering the Commission's definition of the word "process," we note that a regulation should be construed to give effect to the natural and plain meaning of its words. *Diamond Roofing, Inc. v. Occupational Safety and Health Review Commission*, 528 F.2d 645, 649 (5th Cir. 1976).

Section 1.2.1 of the Commission's rules and regulations defines process as:

---

4. The results of the May, 1979 stack test may be categorized as follows:

May, 1979 Stack Test

| Runs | Emission Rate (lbs./hr.) | Allowable Emission Rate Under the Commission's Interpretation (lbs./hr.) |
|------|------|------|
| 1 | 20.91 | 43.35 |
| 2 | 22.82 | 43.00 |
| 3 | 31.00 | 44.12 |
| Avg. | 24.91 | 43.49 |

5. Section 1.2.1 of the Alabama Air Pollution Control Commission's rules and regulations provides, in pertinent part:

> "Process" shall mean any action, operation, or treatment of materials, including handling and storage thereof, which may cause discharge of an air contaminant or contaminants into the atmosphere, but excluding fuel burning and refuse burning.

Any action, operation, or treatment of materials, including handling and storage thereof, which may cause discharge of an air contaminate into the atmosphere, but excluding fuel burning and refuse burning.

The first phase of the steel-making process is dubbed charging—where scrap metal and molten metal are placed in the BOF vessel. Scrap metal and molten metal are unquestionably materials used in the steel-making process. Process as defined by section 1.2.1 includes handling and storage of materials. Giving effect to the natural and plain meaning of the phrase "handling of materials," we find that the placing of molten and scrap metal into the BOF vessel is a material handling procedure within the meaning of section 1.2.1. Therefore, the charging phase of the steel-making process is encompassed by the definition of the term process under section 1.2.1.

The second phase is the actual steel-making or blow phase of the steel-making process. During this phase, oxygen is injected into the molten metal to convert it into steel. Process as defined by section 1.2.1 encompasses treatment of materials. As we noted earlier, molten and scrap metal constitute materials used in the steel-making process. Treatment is not defined by section 1.2.1. Under the normal usage of the word,[6] however, injection of oxygen into molten metal constitutes treatment of materials.

The final phase, tapping, occurs when the molten steel is poured from the BOF vessel. As noted above, the term process as defined by section 1.2.1 includes "handling of materials." In our view, the tapping phase, like the charging phase, constitutes a material handling procedure. Surely, under the plain meaning of the term process in section 1.2.1, oxidized molten metal is handled when it is poured from the BOF vessel.

After considering the Commission's definition of the word process, we find that the charging, blow, and tapping phases of the steel-making process constitute one process under section 1.2.1 and not separate and distinct processes as urged by Republic Steel.

Our decision is buttressed by the fact that during the past seven years, the Commission has interpreted the three phases of steel-making to constitute one process. Where an agency's interpretation of its own regulations is reasonable, it must stand even though it may not appear as reasonable as some other. *E. g. Homan and Crimen, Inc. v. Harris,* 626 F.2d 1201 (5th Cir. 1980). In light of section 1.2.1's definition of the word "process," we consider reasonable the Commission's interpretation that the three phases of the steel-making process constitute one process.

## II

■ Our finding that the three phases of steel-making constitute one process under section 1.2.1, necessarily means that Republic Steel was not in compliance with section 4.4.1 in 1978. The next question, therefore, is whether the trial court erred in failing to impose civil penalties and to grant injunctive relief. The trial court, in refusing to order civil penalties and grant injunctive relief relied on the attitude and laudable efforts of Republic Steel "in continuously trying to improve the level of emissions." Finding that the imposition of sanctions was within the sound discretion of the court, the trial court refused to order sanctions.

We agree with the trial court that sanctions are not warranted in this case. Republic Steel, since 1972, has continuously sought to improve the level of emissions created during the steel-making process. In 1976, Republic Steel's electrostatic pre-

---

**6.** Webster's New Collegiate Dictionary 1235 (1979), defines "treatment" as "the act or manner or an instance of treating someone of something."

cipitator was only able to capture emissions created during the blow phase of the steel-making process. The emissions generated during the charging and tapping phases passed uncontrollably into the atmosphere. As a result, the Commission was able to test the effectiveness of Republic Steel's electrostatic precipitator only in so far as it captured emissions during the blow phase. The results of the May, 1976 test indicated that the particulate emissions generated during the blow phase were within the allowable limits of section 4.4.1. Even in light of these positive test results, Republic Steel voluntarily experimented with new equipment which captured emissions created during the charging and tapping phases of the steel-making process. With this new equipment incorporated into Republic Steel's pollution control system, a stack test, conducted at the request of the Commission, indicated that the emissions generated during the three phases of the steel-making process were not within the allowable limits of section 4.4.1. It would be a travesty of justice to impose sanctions on this company which voluntarily updated its equipment to capture emissions generated during all three phases of the steel-making process, where using its original equipment the tests would have only considered emissions generated during one phase of the steel-making process. In addition, at least one of the test runs in 1978 suggested compliance with section 4.4.1.

Moreover, the May, 1979, stack test indicated that the particulate emissions generated during all three phases of the steel-making process were well within the allowable emission rates set out in section 4.4.1.

Under these circumstances, we find that the trial court did not abuse its discretion in refusing to impose sanctions and grant injunctive relief.

## CONCLUSION

We hold that: (1) the three phases of steel-making constitute one process within the meaning of section 1.2.1; and (2) the

trial court did not err in declining to impose sanctions and grant injunctive relief. Accordingly, we reverse in part and affirm in part.

REVERSED IN PART AND AFFIRMED IN PART.