[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13649

_____

D.C. Docket No. 8:16-cv-00935-MAP

LINDELL WASHINGTON,

Plaintiff - Appellant,

versus

COMMISSIONER OF SOCIAL SECURITY,

Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(October 29, 2018)

Before TJOFLAT, MARCUS, and NEWSOM, Circuit Judges.

MARCUS, Circuit Judge:

The disability programs administered under the Social Security Act "are of a

size and extent difficult to comprehend." Richardson v. Perales, 402 U.S. 389, 399

(1971); see also Heckler v. Day, 467 U.S. 104, 106 (1984) ("Approximately two million disability claims were filed under [the Social Security Act] in fiscal year 1983. Over 320,000 of these claims must be heard by some 800 administrative law judges each year."). In 2017 alone, approximately 2.2 million disability applications were filed, and the Social Security Administration (SSA) disbursed $54 billion in benefits. See Social Security Administration, Annual Report of the Supplemental Security Income Program (2017); Selected Data from Social Security's Disability Program, www.ssa.gov/oact/STATS/dibStat.html. The federal government's provision of disability benefits represents an enormous administrative undertaking.

This appeal is about the legal standards by which Administrative Law Judges (ALJ) within the SSA adjudicate whether a claimant is "disabled" under Title II of the Social Security Act, 42 U.S.C. § 401 et seq., and, therefore, entitled to disability benefits. More specifically, it is about the ALJ's duty to investigate and develop an adequate factual record to support a disability determination in cases where expert testimony offered by a Vocational Expert (VE) is contradicted by an authoritative Department of Labor (DOL) publication -- the Dictionary of Occupational Titles (DOT) -- that the SSA frequently relies on. Ultimately, the case is about what constitutes "substantial evidence" to support an ALJ's decision to deny an application for benefits.

2

How we resolve these issues depends on the meaning and application of Social Security Ruling 00-4p (SSR 00-4p).  In SSR 00-4p, the SSA offered a "policy interpretation" of its regulations governing the adjudication of disability claims.  SSR 00-4p, 2000 WL 1898704 (Dec. 4 2000).  The Ruling clarified what ALJs must do to resolve conflicts between the DOT and expert evidence.  After careful review, we conclude that, pursuant to the terms of the Ruling, and in light of the overall regulatory scheme that governs disability claims, the ALJs within the SSA have an affirmative duty to identify apparent conflicts between the testimony of a Vocational Expert and the DOT and resolve them.  This duty requires more of the ALJ than simply asking the VE whether his testimony is consistent with the DOT.  Once the conflict has been identified, the Ruling requires the ALJ to offer a reasonable explanation for the discrepancy, and detail in his decision how he has resolved the conflict.  The failure to discharge this duty means that the ALJ's decision, when based on the contradicted VE testimony, is not supported by substantial evidence.

Central to our holding is the recognition that in the context of a Social Security disability adjudication we are dealing with an inquisitorial proceeding.  Few, if any, agency adjudications depart more markedly from the adversarial customs that define the American legal tradition than do SSA hearings.  In processing disability claims, the ALJs do not simply act as umpires calling balls

3

and strikes. They are by law investigators of the facts, and are tasked not only with the obligation to consider the reasons offered by both sides, but also with actively developing the record in the case. Accordingly, although independently identifying and resolving the points of apparent conflict between expert testimony and other evidence would be out of character for most judges, for a Social Security ALJ it can be fairly said to come with the territory. Here, the ALJ failed to meet his obligations to identify, explain, and resolve an apparent conflict between the testimony of the VE and the DOT on a matter of considerable importance, and, therefore, we are required to reverse the judgment of the district court and remand the case with instructions to send it back to the Commissioner to resolve the apparent conflict evident in this record.

## I.

Lindell Washington has type 2 diabetes. Because of his diabetes, he suffers from diabetic neuropathy -- a type of nerve damage that can occur as a consequence of diabetes that causes pain and numbness in the extremities -- and decreased visual acuity. He is also obese, and has a history of alcohol abuse. In the past, Washington has worked as a dishwasher, auto detailer, sander, and warehouse worker. He has a high school education, and served in the Army for a time. Washington says he is disabled on account of his illnesses.

4

In November of 2012, Washington filed a claim for disability benefits with the SSA.  His claim was initially denied in December of that year and again on reconsideration in March of 2013.  Appellant then sought a hearing before an ALJ, which was held on August 5, 2014.  He was represented by counsel during the proceeding.  At the hearing, Washington provided extensive testimony and offered documentary evidence about his various health problems.  Among other things, he testified about pain and swelling in his hands and feet on account of his diabetes.  He also explained that he has difficulty with certain basic tasks, such as buttoning his shirts and tying his shoes.  During the hearing, the ALJ asked Washington to pick up a pen, which he was unable to do.

After Washington testified, the ALJ called a Vocational Expert[1] (VE) to provide evidence about the availability of jobs that Washington could perform.  The ALJ posed a hypothetical question about an individual with all of Washington's relevant characteristics, including that, because of his neuropathy, he would not be able to engage in "fine manipulation" with his fingers, and because of his visual impairments he would not be able to work around hazardous equipment or heights.  In response, the VE testified there were no jobs the individual could perform because all such jobs required at least occasional fine manipulation.  The

---

[1] At the hearings and appeals levels of Social Security proceedings, Vocational Experts are vocational professionals who provide impartial expert opinions either by testifying or by providing written responses to interrogatories.  SSR 96-9p, 1996 WL 374185 (July 2, 1996).

5

ALJ then posed the same hypothetical except he proffered that the individual could perform occasional fine manipulation, also referred to as "occasional fingering." In response, the VE identified two available jobs: table worker and bagger. The VE further opined that the table worker job involved inspecting larger items such as DVD cases or aspirin bottles for defects, and thus, would not involve fine detail work. He also explained that the bagger job entailed placing items -- such as clothing or jewelry -- into bags.

The ALJ then asked the VE if his testimony was consistent with the Dictionary of Occupational Titles (DOT).[2] The VE responded that his testimony was consistent and that he based his testimony on his experience, including having conducted onsite analyses of the jobs he identified. Washington's attorney declined the invitation to question the VE.

The ALJ followed a five-step sequential process and concluded that Washington was not disabled. The ALJ determined that Washington could find work as a bagger or table worker despite his impairments. On this basis, the ALJ

---

[2] The DOT is an extensive compendium of data about the various jobs that exist in the United States economy, and includes information about the nature of each type of job and what skills or abilities they require. The Department of Labor was responsible for compiling it. As of 1999, the Department stopped producing new editions of the work, and much of the data contained in the DOT is now found in online databases. See generally Department of Labor, Revising the Standard Occupational Classification System (1999), https://www.bls.gov/soc/socrpt929.pdf. The SSA is currently developing a new Occupational Information System to replace the DOT and provide its ALJs with more up to date information about current occupations and their requirements. See Social Security Agency, Occupational Information System Project (2018), https://www.ssa.gov/disabilityresearch/occupational_info_systems.html.

denied his claim for benefits.  In his decision, the ALJ also stated that, "[p]ursuant to SSR 00-4p, the undersigned has determined that the vocational expert's testimony is consistent with the information in the Dictionary of Occupational Titles."  The order contained no other discussion of whether or how the VE's testimony was consistent with the DOT.

After exhausting his administrative remedies, Washington sought relief from the denial of benefits in the United States District Court for the Middle District of Florida.  There, he challenged the ALJ's decision on the grounds that it was not supported by substantial evidence because the ALJ had failed to properly identify, explain, and resolve an apparent conflict between the VE's testimony and the DOT, as required by SSR 00-4p.  In particular, Washington observed that the VE expressly said that a person who is capable of only occasional fingering could work the jobs of bagger and table worker.  In sharp contrast, however, the DOT describes both of these jobs as requiring frequent fingering.  See DOT § 734.687-014 (4th ed. 1991) (listing job requirements for table workers, including "Fingering: Frequently - Exists from 1/3 to 2/3 of the time"); DOT § 920.687-018 (4th ed. 1991) (listing job requirements for baggers, including "Fingering: Frequently – Exists from 1/3 to 2/3 of the time").  The district court rejected this challenge, concluding that the ALJ fulfilled his duties under SSR 00-4p simply by asking the VE if he had testified consistently with the DOT.

This timely appeal ensued.

## II.

In reviewing the denial of Social Security disability benefits, "this Court and the district court must review the agency's decision and determine whether its conclusion, as a whole, was supported by substantial evidence in the record." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005).  Section 405(g) of Title 42 also prescribes that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson, 402 U.S. at 401.  "Put differently, we must decide whether on this record it would have been possible for a reasonable jury to reach the [agency's] conclusion." Allentown Mack Sales & Serv., Inc. v. N.L.R.B., 522 U.S. 359, 366–67 (1998).  Since our standard of review in a Social Security case is the same as the one that governs the district court, we owe the trial court's decision no deference. Miles v. Chater, 84 F.3d 1397, 1400 (11th Cir. 1996).  "Remand for further factual development of the record before the ALJ is appropriate where the record reveals evidentiary gaps which result in unfairness or clear prejudice." Henry v. Comm'r of Soc. Sec., 802 F.3d 1264, 1267 (11th Cir. 2015) (quotation omitted).

We are also required to review de novo whether the Commissioner's decision was based on a proper view of the law. Ellison v. Barnhart, 355 F.3d 1272, 1275 (11th Cir. 2003); Henry, 802 F.3d at 1266; see also Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999) ("We affirm the Commissioner's decision on a disability benefits application if it is supported by substantial evidence and the Commissioner applied the correct legal standards.").

## A.

"Under the Social Security Act, the [SSA] is authorized to pay disability insurance benefits and Supplemental Security Income to persons who have a 'disability.'" Barnhart v. Thomas, 540 U.S. 20, 21 (2003). Title II of the Act defines a "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Act sharpens this definition by also providing that a person qualifies as disabled, and is thereby eligible for benefits, "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." Id. § 423(d)(2)(A). In turn, the statute defines "work which exists in the national

9

economy" to mean "work which exists in significant numbers either in the region where such individual lives or in several regions of the country." Id.

To determine whether a claimant is disabled, the SSA conducts a "five-step sequential evaluation process." 20 C.F.R. § 416.920(a)(1). The evaluation is made at a hearing conducted by an ALJ. The first three steps deal with whether the claimant is currently engaged in "substantial gainful activity," the "medical severity of the [applicant's] impairment(s)," and whether the impairments meet the requirements of a listed impairment. Id. § 416.920(a)(4). If the claimant has failed to establish that he is disabled at the third step, the ALJ will proceed to step four and consider the claimant's "residual functional capacity" and his "past relevant work" in order to determine whether he can still engage in the kind of gainful employment that he has undertaken in the past. Id. § 416.920(a)(4)(iv). At step four, the claimant carries a heavy burden of showing that his impairment prevents him from performing his past relevant work. See Bloodsworth v. Heckler, 703 F.2d 1233, 1240 (11th Cir. 1983) ("The scheme of the Act places a very heavy initial burden on the claimant to establish existence of a disability by proving that he is unable to perform his previous work.").

If the claimant successfully establishes the existence of an impairment that prevents him from doing the kind of work that he has done in the past, the evaluation proceeds to step five. At step five the burden of going forward shifts to

10

the SSA "to show the existence of other jobs in the national economy which, given the claimant's impairments, the claimant can perform." Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987). If the SSA makes this showing, "the burden shifts back to the claimant to prove she is unable to perform the jobs suggested by the [SSA]." Id.; see also Jones, 190 F.3d at 1228 ("At the fifth step, the burden shifts to the Commissioner to determine if there is other work available in significant numbers in the national economy that the claimant is able to perform. If the Commissioner can demonstrate that there are jobs the claimant can perform, the claimant must prove she is unable to perform those jobs in order to be found disabled.") (citation omitted). If the claimant demonstrates that he is unable to perform the work suggested by the Commissioner on account of his impairment, the ALJ will find that he is disabled and entitled to disability benefits. 20 C.F.R. § 416.920(a)(4)(v). Although the burden temporarily shifts at step five, "the overall burden of demonstrating the existence of a disability as defined by the Social Security Act unquestionably rests with the claimant." Doughty v. Apfel, 245 F.3d 1274, 1280 (11th Cir. 2001) (quotations omitted).

The SSA's regulations establish how the agency may determine whether there is suitable work available in the national economy at step five. See 20 C.F.R. § 416.966. The regulations, much like the statute itself, provide that "[w]ork exists in the national economy when there is a significant number of jobs (in one or more

11

occupations) having requirements which [the claimant is] able to meet with [his] physical or mental abilities and vocational qualifications." Id. § 416.966(b). Furthermore, this provision enumerates the sources of jobs data that the ALJ should consider. In particular, it provides that:

> When we determine that unskilled, sedentary, light, and medium jobs exist in the national economy (in significant numbers either in the region where you live or in several regions of the country), we will take administrative notice of reliable job information available from various governmental and other publications. For example, we will take notice of—
>
> (1) Dictionary of Occupational Titles, published by the Department of Labor …

Id. § 416.966(d). In addition, it provides that:

> If the issue in determining whether you are disabled is whether your work skills can be used in other work and the specific occupations in which they can be used, or there is a similarly complex issue, we may use the services of a vocational expert or other specialist. We will decide whether to use a vocational expert or other specialist.

Id. § 416.966(e). Put simply, the critical inquiry at step five is whether jobs exist in the national economy in significant numbers that the claimant could perform in spite of his impairments, and the ALJ can consider both jobs data drawn from the DOT as well as from the testimony of the VE in making this determination.

Step five in the evaluation process -- and in particular how to weigh conflicting VE and DOT evidence at that stage -- was, for years, a source of contention. See, e.g., Tom v. Heckler, 779 F.2d 1250, 1255 (7th Cir. 1985) (remanding case because of conflict between the VE's testimony and the DOT);

12

Mimms v. Heckler, 750 F.2d 180, 186 (2d Cir. 1984) (remanding case for reconsideration of jobs claimant could perform in light of DOT descriptions that called VE testimony into question). The circuits were split over when an ALJ faced with a conflict could credit a VE over the DOT. See, e.g., Montgomery v. Chater, 69 F.3d 273, 276 (8th Cir. 1995) (establishing a rebuttable presumption in favor of the DOT); Conn v. Sec'y of Health and Human Servs., 51 F.3d 607, 610 (6th Cir. 1995) (allowing an ALJ to credit a VE over the DOT); see also Haddock v. Apfel, 196 F.3d 1084, 1091 (10th Cir. 1999) (imposing on the ALJ a duty to investigate and explain the conflict). In Jones v. Apfel, 190 F.3d 1224 (11th Cir. 1999), a panel of this Court went some way toward resolving the controversy by holding that "an ALJ may rely solely on the VE's testimony" when that testimony conflicts with the DOT. Jones, 190 F.3d at 1230.[3]

About a year after this Court decided Jones, the SSA issued a Policy Interpretation Ruling providing detailed guidance on how the ALJs should go

---

[3] We said in Jones that we "agree[d] with the Sixth Circuit," and explicitly relied on two Sixth Circuit precedents that gave the ALJ discretion to credit VE testimony over the evidence provided in the DOT. See id. at 1229–30 (citing Conn, 51 F.3d at 610 and then citing Barker v. Shalala, 40 F.3d 789, 795 (6th Cir. 1994)). The first said that the DOT was "not the sole source of admissible information concerning jobs" and that it was within the ALJ's discretion to credit a VE's testimony over the DOT. Barker, 40 F.3d at 795. The second reiterated: "the ALJ may accept testimony of a [VE] that is different from information in the [DOT]." Conn, 51 F.3d at 610 (emphasis added). To the extent that Jones might be read to suggest that "the VE's testimony 'trumps' the DOT" automatically and irrebuttably, we do not read the opinion in that way, since neither Sixth Circuit case says that an ALJ must credit the VE over the DOT, and the Jones opinion itself observed that, "an ALJ may rely solely on the ALJ's testimony," Jones, 190 F.3d at 1230 (emphasis added), not that the ALJ must rely on the VE's testimony. See id. at 1229–30. Regardless, though, Jones no longer controls the outcome here, as we explain below.

about weighing VE testimony and data in the DOT.  SSR 00-4p, 2000 WL 1898704 (Dec. 4 2000).  The Ruling is characterized by the SSA as a "policy interpretation" of 20 C.F.R. § 416.966 that seeks "to clarify [the] standards for identifying and resolving . . . conflicts" between these two sources of evidence.  SSR 00-4p, 2000 WL 1898704, at *2.  In the Ruling, the SSA explains that "[n]either the DOT nor the VE or VS evidence automatically 'trumps' when there is a conflict."  Id.  Instead, the Ruling directs ALJs to "[i]dentify and obtain a reasonable explanation for any conflicts."  Id. at *1.  Only after discharging these duties can an ALJ rely on VE testimony in making his determination at step five. Id.

Both sides agree that SSR 00-4p governs the resolution of this case and thus we ought to apply it here.  This is not to say that we are bound by agency rulings that interpret an agency's regulations.  We are not.  B. B. v. Schweiker, 643 F.2d 1069, 1071 (5th Cir. 1981).[4]  But the Rulings are binding within the Social Security Administration.  20 C.F.R. § 402.35(b)(1) ("[SSA Rulings] are binding on all components of the Social Security Administration.").  We require the agency to follow its regulations "where failure to enforce such regulations would adversely affect 'substantive rights of individuals.'"  First Ala. Bank, N.A. v. United States,

---

[4] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

14

981 F.2d 1226, 1230 n.5 (11th Cir. 1993) (quoting Morton v. Ruiz, 415 U.S. 199, 232 (1974)); see also Romano-Murphy v. C.I.R., 816 F.3d 707, 720 (11th Cir. 2016); Gonzalez v. Reno, 212 F.3d 1338, 1349 (11th Cir. 2000) ("Agencies must respect their own procedural rules and regulations."). This is the case even where, as here, "the internal procedures are more rigorous than otherwise would be required." Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. 1981) (per curiam).

Jones had set a floor on SSA procedures. Thereafter, the SSA stepped in, explained and clarified the governing rules and exercised its prerogative to strengthen its own procedural requirements, and established an enhanced duty on the part of the ALJ to discern and resolve conflicts. See Chrysler Corp. v. Brown, 441 U.S. 281, 312–13 (1979) ("It is within an agency's discretion to afford parties more procedure, but it is not the province of the courts to do so."). Since the SSA did step in, and since the substantive rights of Lindell Washington and other benefits applicants are at stake, we will require the agency to follow the procedure laid out in SSR 00-4p. Our task today, then, is limited to interpreting the nature and meaning of the SSA's Ruling, its relation to the regulations, and the general statutory framework created by Congress.

## B.

The meaning of SSR 00-4p is at the heart of this appeal. Washington argues that SSR 00-4p imposes a robust duty on the ALJs to independently identify and

15

resolve VE-DOT conflicts.  Conversely, the Commissioner says that the ALJ's duties under the Ruling are satisfied simply by asking the VE if he has testified consistently with the DOT, which is what occurred here.  After close review, we conclude that Washington has the better of the argument.

SSR 00-4p imposes a duty on ALJs to identify and resolve apparent conflicts between DOT data and VE testimony, and this duty is not fulfilled simply by taking the VE at his word that his testimony comports with the DOT when the record reveals an apparent conflict between the VE's testimony and the DOT.  Rather, as we see it, the ALJ has an affirmative obligation to identify any "apparent" conflict and to resolve it.  The failure to properly discharge this duty means the ALJ's decision is not supported by substantial evidence.  In reaching this conclusion, we are in agreement with at least four of our sister circuits that have addressed this question.  See, e.g., Hackett v. Barnhart, 395 F.3d 1168, 1175 (10th Cir. 2005); Overman v. Astrue, 546 F.3d 456 (7th Cir. 2008); Moore v. Colvin, 769 F.3d 987 (8th Cir. 2014); Pearson v. Colvin, 810 F.3d 204 (4th Cir. 2015); see also Haddock v. Apfel, 196 F.3d 1084, 1087 (10th Cir. 1999) (holding, before SSR 00-4p was issued, that the "ALJ must investigate and elicit a reasonable explanation for any conflict between the Dictionary and expert testimony before the ALJ may rely on the expert's testimony as substantial

evidence to support a determination of nondisability."). But see Lindsley v. Comm'r of Soc. Sec., 560 F.3d 601, 606 (6th Cir. 2009).

Ordinarily we construe regulations and other regulatory materials in much the same way we interpret statutes. See KCMC, Inc. v. F.C.C., 600 F.2d 546, 549 (5th Cir. 1979) ("We approach the issue at hand by noting that, in construing a regulation, we must employ the rules of construction generally applicable to statutes."). This means that we start -- and often end -- with the text. See Chase Bank USA, N.A. v. McCoy, 562 U.S. 195, 204 (2011). "[A] regulation should be construed to give effect to the natural and plain meaning of its words." Ala. Air Pollution Control Comm'n v. Republic Steel Corp., 646 F.2d 210, 213 (5th Cir. 1981). In addition, we look to the stated purpose of the regulation, as well as the broader regulatory and statutory context of which it is a part. See Pennzoil Co. v. F.E.R.C., 645 F.2d 360, 383 (5th Cir. 1981) ("Administrative regulations are to be interpreted broadly and liberally to effectuate their essential purposes."). We add that principles of statutory interpretation "do not necessarily carry over wholesale to regulatory interpretation." Butterworth v. Bowen, 796 F.2d 1379, 1389 (11th Cir. 1986). But for purposes of interpreting the regulatory text at issue here, we find the rules of statutory construction to be useful aids to our analysis.

To begin, SSR 00-4p's statement of purpose strongly suggests that the ALJ has an affirmative duty to ascertain the existence of conflicts. It declares that ALJs

"must: Identify and obtain a reasonable explanation for any conflicts between occupational evidence provided by VEs or VSs and information in the Dictionary of Occupational Titles (DOT) . . . and [e]xplain in the determination or decision how any conflict that has been identified was resolved."  SSR 00-4p, 2000 WL 1898704, at *1 (emphasis added).  The ALJ's duties are thus three-fold and defined in the conjunctive.  The ALJ must not only "identify . . . any conflicts," but also explain any discrepancy and detail in the decision how the discrepancy was resolved.  This language places the burden squarely on the ALJ to determine whether there are any conflicts.  See Pearson, 810 F.3d at 208 ("From its outset, the Ruling sets forth multiple responsibilities and places all of them on the ALJ.").  Further, the Ruling does not cabin this duty with any language suggesting that it is limited to conflicts the ALJ is put on notice of by the claimant or by the VE.  Rather, by the terms of the Ruling's statement of purpose, the ALJ's duty is defined in an expansive manner.

Next, in the section entitled "The Responsibility To Ask About Conflicts," the Ruling states that ALJs have "an affirmative responsibility to ask about any possible conflict between [] VE or VS evidence and information provided in the DOT."  SSR 00-4p, 2000 WL 1898704, at *4.  The Ruling then breaks down this responsibility into two parts, explaining that, "in these situations," the ALJ must first "Ask the VE or VS if the evidence he or she has provided conflicts with

18

information provided in the DOT"; and, second, if "the VE's or VS's evidence appears to conflict with the DOT," the ALJ must "obtain a reasonable explanation for the apparent conflict." Id. (emphasis added).

This section establishes a separate duty to explore any "apparent conflict," regardless of whether the VE identified the conflict for the ALJ when questioned. See Overman, 546 F.3d at 463 ("Here, the ALJ satisfied this first step by asking the VE if his testimony was consistent with the DOT; the VE answered (wrongly, as it turns out) that it was. If evidence from a VE 'appears to conflict with the DOT,' SSR 00-4p requires further inquiry: an ALJ must obtain 'a reasonable explanation for the apparent conflict.'"). Put another way, the provision articulates a general duty to "ask about" conflicts, and posits two ways that an ALJ must discharge this responsibility, which are distinct and independent from one another. See Pearson, 810 F.3d at 208 ("Notably, this second requirement is so independent of the first that it does not rest on the vocational expert's identification of a conflict."). The ALJ must ask the VE whether there is a conflict and must ask for an explanation if there appears to be a conflict. Whenever a conflict is "apparent," the ALJ must also ask the VE about it. Moreover, "[w]hen an ALJ identifies an apparent conflict that was not raised during a hearing, [the ALJ] can request an explanation of the conflict by submitting interrogatories to the vocational expert." Id. at 210 n.4 (citing Social Security Administration, Hearings, Appeals, and

19

Litigation Law Manual, ch. I–2–5 § 30(C)(2015)).  During or after the hearing, the ALJ is expected to take notice of apparent conflicts, even when they are not identified by a party, and resolve them.

The independent obligation of the hearing examiner to identify and resolve apparent conflicts between the VE and the DOT is reinforced in the final provision of the Ruling.  This section describes how the ALJ is required to explain and resolve any conflict in a final decision.  Notably, it provides that the ALJ "must explain the resolution of the conflict irrespective of how the conflict was identified."  SSR 00-4p, 2000 WL 1898704, at *4 (emphases added).  The Ruling anticipates that an ALJ will satisfy his duty-to-identify in many ways. Asking the VE about whether there is a conflict is not the only thing required of an ALJ. Indeed, if that were not the case the ALJ could ignore explaining and resolving any apparent conflict (such as the one that existed in this case) simply by asking one question of the VE and relying on his erroneous answer.

Our interpretation of the Ruling's text is further informed by the broader regulatory scheme of which it is a part.  Cf. Smith v. United States, 508 U.S. 223, 233 (1993) ("Just as a single word cannot be read in isolation, nor can a single provision of a statute. As we have recognized: Statutory construction . . . is a holistic endeavor." (quotation omitted)); United States v. Rigel Ships Agencies, Inc., 432 F.3d 1282, 1288 (11th Cir. 2005) ("In any question of statutory

20

interpretation, we do not look at one word or term in isolation, but instead we look to the entire statutory context.").

Unlike judicial proceedings, disability hearings "are inquisitorial rather than adversarial." Sims v. Apfel, 530 U.S. 103, 111 (2000) (plurality opinion). Indeed, "[t]he differences between courts and agencies are nowhere more pronounced than in Social Security proceedings. Although many agency systems of adjudication are based to a significant extent on the judicial model of decisionmaking, the SSA is perhaps the best example of an agency that is not." Id. at 110 (quotations and citations omitted). Because Social Security hearings basically are inquisitorial in nature, "[i]t is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits." Id. at 111; see also Crawford & Co. v. Apfel, 235 F.3d 1298, 1304 (11th Cir. 2000) ("[The SSA] has replaced normal adversary procedure with an investigatory model."). Thus, "the ALJ has a basic duty to develop a full and fair record. This is an onerous task, as the ALJ must scrupulously and conscientiously probe into, inquire of, and explore for all relevant facts." Henry, 802 F.3d at 1267.

The inquisitorial nature of disability hearings is prescribed by SSA regulations. In relevant part, the regulations provide that the ALJ must conduct the hearings "in an informal, non-adversarial manner." 20 C.F.R. § 416.1400(b). The regulations also provide that the agency "will consider at each step of the review

process any information [the claimant] present[s] <u>as well as all the information in [the agency's] records</u>." <u>Id.</u> (emphasis added). Thus, the SSA generally takes upon itself the responsibility of identifying information in its records relevant to the resolution of a party's claim. In fact, "the [SSA Appeals] Council does not depend much, if at all, on claimants to identify issues for review." <u>Sims</u>, 530 U.S. at 112. Indeed, at the appellate stage of the agency's review, the SSA's regulations do not even require a claimant to file a brief. <u>See</u> 20 C.F.R. § 416.1475. Relatedly, at the hearing stage, the Commissioner does not have a representative that appears "before the ALJ to oppose the claim for benefits." <u>Crawford & Co.</u>, 235 F.3d at 1304. Rather, only the claimant -- who often appears pro se -- and the ALJ participate at the hearing stage. <u>See</u> <u>id.</u>; <u>Sims</u>, 530 U.S. at 111. Thus, in numerous and varied ways, the SSA's adjudicatory scheme exudes the air of an inquisitorial process.

This too is important to our resolution of the case. First, it reinforces the idea that SSR 00-4p imposes an independent, affirmative obligation on the part of the ALJ to undertake a meaningful investigatory effort to uncover apparent conflicts, beyond merely asking the VE if there is one. The Ruling is consonant with the nature of the entire Social Security regulatory scheme. <u>See</u> <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 556 (3d Cir. 2005) ("By its terms, SSR 00-4p was designed to address the already-well-established (in this Circuit and elsewhere)

22

obligation of an ALJ to develop the record during an adjudicative hearing.") (citation omitted).  Since many claimants appear pro se, imposing this duty may be essential to the proper resolution of disability claims.

We also note the importance the SSA attaches to the Dictionary of Occupational Titles as a source of jobs data.  As SSR 00-4p itself explains, the SSA "rel[ies] primarily on the DOT . . . for information about the requirements of work in the national economy."  SSR 00-4p, 2000 WL 1898704, at *2.  Similarly, 20 C.F.R. § 416.966(d) explicitly names the DOT as one of the main sources of jobs data the SSA relies on, and provides that ALJs "will take administrative notice of reliable job information available" in the DOT.  This subsection places the DOT first in its list of reliable government sources.  Id.  What's more, other SSA Rulings describe the DOT as "authoritative."  See, e.g., SSR 96-9p. Plainly the DOT is integral to disability hearings.

The importance of the DOT, coupled with the robust nature of the ALJ's investigatory responsibilities, gives further meaning to the obligations imposed on the ALJ by the Ruling to identify, explain, and resolve "apparent conflicts."  We add that, given the DOT's significance as a source of jobs data regularly relied on by the ALJ, it seems to us quite likely that the ALJs are familiar with and have ready access to it.  This seems especially likely since the Social Security Administration requires the ALJs to take administrative notice of the DOT.  Any

23

apparent conflict, then, between the VE's testimony and DOT data is likely not something the ALJ will need much help in identifying. Nor does it seem consistent with the DOT's status as a primary source of jobs data that an ALJ could discharge his duty to gather the facts and develop arguments on both sides of a claim by simply taking a VE at his word that there is no conflict. An "apparent conflict" is thus more than just a conflict that is made apparent by the express testimony of the VE. It is a conflict that is reasonably ascertainable or evident from a review of the DOT and the VE's testimony. At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case. Since the ALJs frequently use the DOT, treat it as an authoritative source, and actively investigate the evidence for and against granting disability benefits, identifying these "apparent conflicts" falls well within their wheelhouse.

Finally, the structure of the Social Security Act also reinforces our reading of the Ruling. As the Supreme Court has observed, "Congress designed [the Social Security Act] to be unusually protective of claimants." Bowen v. City of New York, 476 U.S. 467, 480 (1986) (quotations omitted); see also Heckler v. Day, 467 U.S. 104, 106 (1984) ("To facilitate the orderly and sympathetic administration of the disability program of Title II, the Secretary and Congress have established an unusually protective four-step process."). This too suggests that the ALJ has a

24

duty to identify DOT data that may be helpful to a claimant. See Pearson, 810 F.3d at 210 ("The policies animating the disability benefits adjudication process also support requiring the ALJ to make an independent identification of conflicts, and to do so for apparent conflicts. The Social Security Act is remedial in nature and 'unusually protective' of claimants.").

Thus, we conclude that SSR 00-4p is properly understood to impose an affirmative duty on the ALJs to identify apparent conflicts, ask the VE about them, and explain how the conflict was resolved in the ALJ's final decision. The text of the Ruling strongly suggests as much, and the inquisitorial nature of disability proceedings practically demands it.

## C.

Having established that the ALJ has an affirmative duty to identify and resolve any apparent VE-DOT conflict in a disability hearing, we turn to whether the ALJ who denied Washington's claim breached that duty. We conclude that he did.

The question boils down to whether the conflict was an "apparent" one that the ALJ had a duty to take notice of, ask about, and resolve. As we have explained in this context, "apparent" should be taken to mean apparent to an ALJ who has ready access to and a close familiarity with the DOT. Put another way, if a conflict is reasonably ascertainable or evident, the ALJ is required to identify it, ask about

25

it, and resolve it in his opinion.  We take the word "apparent" to mean "seeming real or true, but not necessarily so."  Pearson, 810 F.3d at 209 (quoting OXFORD DICTIONARY).

By our lights, the difference here between the VE's testimony and the DOT presents one of the clearest examples of an "apparent conflict."  The VE was asked whether there are any jobs in the national economy for someone with Washington's impairments, including the fact that he can only engage in "occasional fingering."  The VE testified that such an individual could work as a bagger and a table worker.  A review of the DOT's entries about these positions, however, indicates that both of these jobs can only be performed by a person who is capable of "frequent fingering."  This means that both jobs require fingering, i.e. "fine manipulation," anywhere from 1/3 to 2/3 of the time.  Thus, while the VE unequivocally testified that there were jobs Washington could perform, the DOT says otherwise.  This doesn't mean that the VE was wrong, but it does mean that there was a conflict, it was apparent, and it was important.  The difference between the ability to occasionally perform a task and frequently perform a task is patent and significant in determining whether work exists in the national economy for a claimant.  See Moore v. Colvin, 769 F.3d 987, 989 (8th Cir. 2014).  What's more, the conflict is manifest from even a cursory, side-by-side comparison of the VE's testimony and the DOT.  The ALJ thus unmistakably breached his duty.

Moreover, the ALJ's mistake was not harmless.  For starters, the conflict between the VE and the DOT is an actual one.  We can't disregard the error on the grounds that no conflict in fact existed.  See Terry v. Astrue, 580 F.3d 471, 478 (7th Cir. 2009) ("[T]he error is harmless unless there actually was a conflict.").  What's more, the VE's testimony on what jobs were available for Washington was sparse, taking up only about a page in the hearing transcript.  Any explanation for how and why he concluded that Washington could work as a bagger and a table worker was de minimis, and the ALJ asked nothing more to elicit a fuller explanation.  We, therefore, have no basis as an appellate court on which to conclude that the ALJ adequately resolved any possible discrepancy in spite of his failure to even acknowledge the conflict.  See Welsh v. Colvin, 765 F.3d 926, 930 (8th Cir. 2014) (concluding that the ALJ had complied with SSR 00–4p because, in response to extensive questioning by the ALJ regarding inconsistencies, the VE offered evidence of her personal observations of the requirements of the proposed jobs and cited a professional journal).

## III.

The long and short of it is that in this disability hearing there was an apparent -- indeed glaring -- conflict, and it passed by the ALJ unnoticed, and therefore unexamined.  By failing to identify and resolve the conflict, the ALJ breached his duty to fully develop the record and offer a reasonable resolution of

27

Washington's claim.  This duty is imposed by SSR 00-4p.  What's more, it is deeply consistent with the nature of SSA proceedings and the ALJ's responsibility as an investigator in this process.  Accordingly, we reverse and remand to the district court so that it may, in turn, remand the matter to the Commissioner for further development of the record.

**REVERSED and REMANDED.**