[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 22-11935

Non-Argument Calendar

_____

JOSEPH RAGUSA,

Plaintiff-Appellant,

*versus*

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 9:21-cv-80235-AMC

_____

Before NEWSOM, GRANT, and EDMONDSON, Circuit Judges.

PER CURIAM:

Joseph Ragusa appeals the district court's order affirming the Social Security Commissioner's denial of his application for disability insurance benefits ("DIB") and supplemental security income ("SSI"). No reversible error has been shown; we affirm.

## I.

When -- as in this case -- an Administrative Law Judge ("ALJ") denies an application for benefits and the Appeals Council denies review, we review the ALJ's decision as the Commissioner's final decision. *See Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).

Our review of the Commissioner's decision is limited to whether substantial evidence supports the decision and whether the correct legal standards were applied. *See Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315, 1320 (11th Cir. 2021). "Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id*. We review *de novo* the ALJ's application of the law. *See id*. "We review *de novo* the district court's determination as to whether the ALJ's decision was supported by substantial evidence." *Id*.

A person who applies for Social Security DIB or for SSI benefits must first prove that he is disabled. *See* 20 C.F.R. §§ 404.1512(a), 416.912(a). The Social Security Regulations outline a

five-step sequential evaluation process for determining whether a claimant is disabled. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The ALJ must evaluate (1) whether the claimant engaged in substantial gainful work; (2) whether the claimant has a severe impairment; (3) whether the severe impairment meets or equals an impairment in the Listings of Impairments; (4) whether the claimant has the residual functional capacity ("RFC") to perform his past relevant work; and (5) whether, in the light of the claimant's RFC, age, education, and work experience, other jobs exist in the national economy the claimant can perform. *Id*.

Following two hearings, the ALJ denied Ragusa's application for DIB and for SSI. Applying the five-step evaluation process, the ALJ found that Ragusa suffered from three severe impairments: ischemic heart disease/coronary artery disease, asthma, and diabetes with neuropathy. The ALJ concluded, however, that Ragusa had no impairment or combination of impairments that met or medically equaled an impairment in the Listing of Impairments.

The ALJ next determined that Ragusa had the RFC to perform light work with specified postural and environmental limitations. Pertinent to this appeal, the ALJ determined that Ragusa must "avoid concentrated exposure to extreme cold/heat, humidity, wetness, fumes, odors, gases, dust and other pulmonary irritants." Considering Ragusa's age, education, work experience, and RFC -- together with the testimony of a vocational expert ("VE") -- the ALJ determined that Ragusa could perform other work in the

national economy.  Accordingly, the ALJ concluded that Ragusa was not disabled.

Ragusa administratively appealed the ALJ's decision to the Appeals Council.  The Appeals Council denied Ragusa's request for review.  The district court affirmed.

## II.

On appeal, Ragusa focuses on step five in the sequential evaluation process.  According to Ragusa, the ALJ's determination that Ragusa could perform other work in the national economy is unsupported by substantial evidence.  In particular, Ragusa challenges the methodology the VE used to estimate the number of available jobs in the national economy.  Ragusa also contends that the ALJ failed to identify and resolve an "apparent conflict" between the VE's testimony and the Dictionary of Titles ("DOT").

"[T]he critical inquiry at step five is whether jobs exist in the national economy in significant numbers that the claimant could perform in spite of his impairments."  *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360 (11th Cir. 2018).  In making this inquiry, the ALJ "does not tally the number of job openings at a given time, but rather approximates the number of positions that exist, whether vacant or filled, and without regard to the location of the work and a claimant's likelihood of being hired."  *See Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1281 (11th Cir. 2020).  To estimate the number of available jobs, the ALJ often relies on the testimony of a VE: a professional with experience in job placement

and knowledge of working conditions.  *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1152 (2019).

At Ragusa's hearing, a VE identified three representative occupations that a hypothetical person with Ragusa's limitations could perform: (1) housekeeper, DOT 323.687-014, with an estimated 102,000 jobs available in the national economy; (2) cashier, DOT 299.687-014, with an estimated 180,000 jobs available in the national economy; and (3) sandwich board carrier, DOT 211.462-010, with an estimated 9,000 jobs available in the national economy.

## A.

On appeal, Ragusa contends that the VE relied on a flawed methodology in determining the estimated number of available jobs for each of the three identified positions.  As a result, Ragusa says the VE's testimony constituted no substantial evidence supporting the ALJ's step-five determination.

To estimate the types and number of jobs a claimant can perform in the national economy, the VE may rely on various publicly-available sources -- including the DOT -- and on "their own experience in job placement or career counseling."  *See Biestek*, 139 S. Ct. at 1152-53 (quotations omitted).  The DOT is a publication produced by the Department of Labor that groups similar jobs into "occupations" and assigns each occupation a code number.  *See Goode*, 966 F.3d at 1281.  The DOT, however, provides no statistical information about the number of jobs available in the national economy.  *See id*.  To estimate the number of available jobs, the VE must therefore consult other sources of employment statistics, like

the Occupational Employment and Wage Statistics program the VE used in this case. *See id.*

Instead of using DOT codes, these statistical sources compile employment data using a job-classification system called the Standard Occupational Classification ("SOC") system. *See Goode*, 966 F.3d at 1281; U.S. BUREAU OF LABOR STATISTICS, OCCUPATIONAL EMPLOYMENT AND WAGE STATISTICS, https://www.bls.gov/oes/oes_emp.htm (last visited 17 August 2023). Because the SOC sorts jobs into broad occupational categories, "a single SOC group may contain multiple DOT occupations." *See Goode*, 966 F.3d at 1281 (noting that, "the use of one system to supply the job titles and another system to provide the job numbers creates a matching problem: a one-to-one correlation does not exist" (brackets omitted)). Thus, after the VE determines the total number of available jobs in a given SOC group, the VE "must use some method for associating SOC-based employment numbers to DOT-based job types." *See id.* at 1283.

Here, the VE testified that he calculated the estimated number of available jobs for each of the representative occupations by dividing the number of available jobs within each of the pertinent SOC groups by the number of DOT codes within that SOC group. This method of calculation is known as the "equal distribution method": a method that "assumes that the total number of jobs that exist for a given SOC group are distributed equally among the number of DOT occupations within that SOC group." *See id.* at 1284. We have included the "equal distribution method" among

the possible methods that are "on the table" for VEs to consider in calculating job availability. *See id.* (stressing that "we express no view on the merits of any particular approach").

Beyond relying on the "equal distribution method," the VE in this case also testified that he relied on the software programs JobBrowser and SkillTRAN to assess the job-incidence data. We have identified the use of these programs as another potential calculation method "on the table" for VEs. *See id.* The VE testified further that he had professional experience placing applicants in cashier and housekeeping positions and had observed those two positions being performed: testimony that demonstrates that the VE applied the calculation methods "in conjunction with his [own] knowledge and expertise." *See id.*

Ragusa has failed to demonstrate that the VE's methodology for estimating the number of available jobs was impermissibly inconsistent or unreliable. Nor has Ragusa presented evidence or data contradicting the VE's job estimates. On this record, we conclude that the VE's testimony about the availability of jobs in the national economy was sufficiently reliable to constitute substantial evidence supporting the ALJ's determination at step five.

B.

Ragusa next contends that the ALJ failed to resolve an "apparent conflict" between the VE's testimony and the DOT's job description for the "sandwich board carrier" job. Given the purported unresolved conflict, Ragusa says a remand is necessary to allow for additional factfinding.

An ALJ has "an affirmative duty" to identify and to resolve "apparent conflicts" between a VE's testimony and the DOT. *See Washington*, 906 F.3d at 1365. An "apparent conflict" is "a conflict that is reasonably ascertainable or evident from a review of the DOT and the VE's testimony." *Id*. ("At a minimum, a conflict is apparent if a reasonable comparison of the DOT with the VE's testimony suggests that there is a discrepancy, even if, after further investigation, that turns out not to be the case."). When an ALJ fails to discharge this duty, "the ALJ's decision, when based on the contradicted VE testimony, is not supported by substantial evidence." *Id*. at 1362.

According to the DOT, the position of "sandwich board carrier" involves constant "exposure to weather" but no exposure to extreme cold, to extreme heat, to atmospheric conditions, or to wet and/or humid conditions.[1] *See* DOT 299.687-014.

---

[1] The Selected Characteristics of Occupations ("SCO") -- a companion publication to the DOT -- clarifies that exposure to "extreme cold," "extreme heat," and "wet and/or humid" conditions means exposure to *"nonweather-related"* cold or hot temperatures and humidity. *See* U.S. DEP'T OF LABOR, SELECTED CHARACTERISTICS OF OCCUPATIONS DEFINED IN THE REVISED DICTIONARY OF OCCUPATIONAL TITLES App. D., at D-1 (rev. ed. 1993) (emphasis added). The SCO also provides that exposure to "atmospheric conditions" means "[e]xposure to such conditions as fumes, noxious odors, dusts, mists, gases, and poor ventilation, that affect the respiratory system, eyes, or the skin." *See id*. at D-2. "[E]xposure to weather," on the other hand, means "[e]xposure to outside atmospheric conditions.*" See id*. at D-1.

Meanwhile, Ragusa's RFC contains no weather-related limitation.[2] Instead, Ragusa's RFC provides that he should "avoid concentrated exposure to extreme cold/heat, humidity, wetness, fumes, odors, gases, dust and other pulmonary irritants": conditions the DOT provides expressly are "Not Present" in the job of "sandwich board carrier." *See id.*

The DOT's job description for "sandwich board carrier" is consistent with the VE's testimony that a claimant with Ragusa's limitations could perform that position. In other words, no "reasonably ascertainable or evident" conflict exists between the DOT and the VE's testimony. The ALJ thus committed no error in relying on the VE's testimony at step five.

Substantial evidence supports the Commissioner's denial of SSI and DBI; we affirm.

AFFIRMED.

---

[2] Never has Ragusa challenged the ALJ's RFC determination or asserted that his RFC should include a weather-related limitation.