[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 24-11613

Non-Argument Calendar

_____

KERRIE LYNN KLARNER,

Plaintiff-Appellant,

*versus*

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 2:23-cv-00025-NPM

_____

Before JORDAN, BRANCH, and KIDD, Circuit Judges.

PER CURIAM:

Kerrie Lynn Klarner appeals the district court's order affirming the Social Security Administration ("SSA") Commissioner's decision denying her applications for disability insurance benefits ("DIB") and Supplemental Security Income ("SSI") based on a finding that she was not disabled. She argues on appeal that (1) the vocational expert's ("VE") testimony did not provide substantial evidence to support the administrative law judge's ("ALJ") decision because the VE's testimony about the number of jobs available in the national economy that she could allegedly perform was inaccurate; (2) the ALJ failed to fully and fairly develop the record; (3) the ALJ failed to provide good cause for rejecting her treating physician Dr. Cox's opinion; and (4) the residual functional capacity ("RFC") determination is not supported by substantial evidence because the ALJ omitted from the determination that Klarner would have difficulty with detailed instructions, despite giving great weight to the opinions of the state agency consultants, Dr. Lewis and Dr. Thibodeau, who found that she had this limitation. After careful review, we affirm.

## I.     Background

### A. Procedural History Leading Up to Current Decision on Appeal

In April 2015, Klarner filed an application for DIB, alleging disability "due to back pain from multiple pinched nerves," disc

herniations, carpal tunnel syndrome, tendonitis, irritable bowel syndrome ("IBS"), and mental illnesses beginning September 12, 2014 through March 31, 2016, which was Klarner's date last insured ("2015 DIB claim"). As relevant to the present appeal, an ALJ denied the DIB claim in 2016 following an evidentiary hearing. As part of the decision, the ALJ in that case considered the medical opinions of, among others, state agency non-examining consultants Drs. Johnson, Mihm, and Hodes; state agency examiner Dr. Bowman; and Klarner's treating physician, Dr. Aloise.[1]

Thereafter, in March 2017, Klarner filed an application for SSI benefits with an alleged disability onset date of September 1, 2014, and a different ALJ ultimately issued a favorable decision

---

[1] According to the ALJ's decision, Dr. Bowman diagnosed Klarner with bipolar disorder and opined that she was "capable of following simple directions and maintaining concentration and a regular schedule" and that she "could perform some complex tasks, but would have difficulty with making decisions, relating to others, and coping with stress." Dr. Johnson "limited [Klarner] to light work with occasional climbing, frequent stooping, with limited handing and fingering." Dr. Mihm opined that Klarner was capable of doing "detailed work and maintaining attention" but should "be limited from working with others" and "would have limitations in concentration and working without interruption." Dr. Hodes opined that Klarner had "moderate limitations with detailed work and maintaining attention" for long periods of time and "limited [Klarner's] social interaction to others and the public." Finally, Dr. Aloise opined that Klarner had "limited sitting and standing abilities" and needed to frequently lie down. He also indicated that Klarner could not "lift more than five pounds and would have handling difficulties."

finding a disability onset date of March 14, 2017.[2] Klarner disagreed with the disability onset date and sought review of the favorable decision with the Appeals Council, asserting that the onset date should have been September 1, 2014. Meanwhile, in December 2020, while the favorable SSI decision was under review with the Appeals Council, Klarner filed a second application for DIB benefits, alleging a disability onset date of December 1, 2016.

With regard to the favorable SSI decision, the Appeals Council granted review and concluded that the decision was not supported by substantial evidence because (1) the ALJ relied in part on medical records that pertained to another individual other than Klarner, and (2) the ALJ found that there were no jobs in the national economy that Klarner could perform, which contradicted the vocational expert's testimony. Accordingly, the Appeals Council vacated the decision and remanded the matter for reconsideration to a different ALJ. In remanding the SSI claim to a different ALJ, the Appeals Council took notice of the pending 2020 DIB application and directed the ALJ on remand to consider whether the applications should be consolidated and ruled on together.

---

[2] Initially, an ALJ denied Klarner's SSI claim after concluding that she was not disabled. However, upon review, the Appeals Council vacated that denial because the ALJ had failed to consider all of the claimant's medically determinable impairments and remanded the case for further proceedings before the same ALJ. On remand, the ALJ issued a favorable decision concluding that Klarner was disabled since March 14, 2017.

### B. Remand and Evidentiary Hearing

On remand, the ALJ consolidated the 2017 SSI application and the 2020 DIB application and held an evidentiary hearing. At the evidentiary hearing, Klarner's non-attorney representative confirmed that he had reviewed the case files.[3] The ALJ asked whether there was "any additional evidence that need[ed] to be submitted," and Klarner's representative stated "I do not believe so at this time." After discussing another piece of evidence, the ALJ again asked whether there was any outstanding evidence, and Klarner's representative again confirmed there was not. The ALJ then addressed the prior 2015 DIB claim, noting that it covered the same time period and inquired as to whether Klarner wanted to reopen the 2015 DIB application or was "just asking [for the ALJ] to adjudicate the new 2020" application. Klarner's representative confirmed that Klarner did not want to open the prior DIB application.

Klarner testified that she had a high school diploma and lived with her boyfriend, his mother, the mother's boyfriend, and the mother's boyfriend's mother.[4] Klarner then testified generally about her jobs before her alleged disability onset date, which included working for many years prior to 2006 at the United States

---

[3] Klarner had counsel during the agency proceedings, but at the evidentiary hearing, she was represented by a non-attorney representative who works with Klarner's counsel's firm. *See* 20 C.F.R. § 416.1505 (providing that a claimant may be represented by an attorney or a qualified non-attorney).

[4] Klarner was 41 years old at the time of the hearing.

Postal Service ("USPS") as a distribution clerk, window clerk, and then a plant supervisor, and working in a call center around 2009 "taking insurance claims." Her job at USPS involved a lot of standing, lifting, and general physical exertion. While working for USPS she developed migraine issues that caused her to miss a lot of work ("[m]ore than once a week"). She also did part-time work for Kohl's department store in 2011 and 2012.[5] In 2020, she worked part-time test-driving cars—Klarner believed she had that job for about two years.

Turning to the alleged disability onset date of 2014, Klarner testified that it was "hard for [her] to remember" what was happening with her medical conditions from "one year [to] another year." But she generally testified that her carpal tunnel syndrome caused her fingers to be "really stiff," her hands to swell, and her wrists to "hurt so excruciatingly bad." She had surgery for the carpal tunnel, and it helped, but she still has symptoms and has to take lots of breaks when doing tasks with her hands. The amount of time she could do a task before needing a break varied and depends on the task, but she said it could be "10 to 20 minutes" of

---

[5]The record also showed that, from 2009 to 2011, she had a medical chart auditing job that required "nonstop typing." In 2015, she worked for one month as a front desk clerk and an unspecified amount of time as a contract driver for a flower shop. And from January 2016 to March 2016, she worked as a casino attendant/customer service representative. Then, in 2017, she worked independently by posting an ad on Craigslist offering to drive people around and help them with errands.

activity.  As a result, she had to be "super careful with cleaning or cooking or handling dishes."

She also testified that she had several herniated discs in her lumbar spine that caused significant pain, a pinched nerve, and difficulty sitting down and standing back up.  The pain in her back radiated at times and felt "electrical," like "a fork . . . jabbing [her] in the lower back."  At least one doctor had recommended surgery, but she had not had surgery because she felt there were just too many herniated discs to even contemplate surgery.  Klarner stated that she could lift up to ten pounds for short periods, like when moving an item from a shopping cart to a car, but if she had to carry anything it needed to be under five pounds.

She stated that she also still suffered from weekly migraines, although they were not as bad as when she worked at USPS, and she has a medication she can take if she feels one coming on.  When a migraine hits, she must lie down in a dark room with complete silence.

Next, Klarner stated that she had IBS, which landed her in the emergency room "several times for the spasming."  However, she explained that her doctors had started her on medication, which made it more manageable and allowed her to avoid emergency room visits, but her IBS still keeps her from doing things.  For instance, if she has an IBS episode, she is unable to cook and clean for herself.

Klarner further explained that she had difficulty sleeping because of her bipolar disorder, which causes racing thoughts.  She

also testified that she had an anxiety disorder and that her mental health symptoms had worsened since 2014.

With regard to activities of daily living ("ADLs"), Klarner testified that she is unable to cook but can prepare tv dinners. She also tries to sweep and mop "once a week for ten minutes," dusts once a month, makes her bed daily, and picks up after herself regularly. Her boyfriend helps her with laundry by carrying the clothes and then she folds them. The mother's boyfriend does all of the cooking and grocery shopping for the household. Klarner explained that she attends all of her medical appointments by herself and gets her nails done regularly at a salon, but other than those activities she does not really leave the house because she is "really panicky," and it makes her not want to go outside.[6]

The VE testified that a hypothetical person of Klarner's age, education, work experience, and additional specified physical and mental limitations would be unable to perform Klarner's past work. However, this individual could perform light work jobs such as (1) marker, and there were 300,000 such positions in the national economy; (2) checker I, and there were 35,000 such positions in the national economy; and (3) router, and there were 52,000 such positions in the national economy. When the ALJ adjusted the physical limitations to "lifting and carrying ten pounds only occasionally and five pounds frequently" with only occasional "handling and fingering," the VE testified that there were "no other

---

[6] The ALJ noted that he also had Klarner's testimony from the two prior evidentiary hearings on her SSI application.

jobs" this hypothetical individual could perform. On cross-examination, the VE testified that the source of job numbers was "SkillTRAN," and the numbers provided reflected only full-time positions.

## C. *Medical Evidence in the Record*

In addition to the testimony from the evidentiary hearings, the ALJ had hundreds of pages of medical records before him. We briefly review the relevant records, focusing on the records that relate most to the issues on appeal.

In 2010, Klarner had surgery for carpal tunnel syndrome. In 2012, she was diagnosed with tendonitis of the left and right wrist. On July 14, 2015, Klarner saw Dr. Joseph Aloise, her primary care physician, for a prescription refill and a disabled parking sticker. During this visit, Klarner reported "muscle aches, muscle weakness, arthralgias/joint pain, and back pain," as well as depression and sleeping issues. Dr. Aloise's notes from the physical exam indicated that Klarner was "well-developed and overweight"; had a normal gait and ambulation; good judgment; normal mood and affect; normal alertness; normal memory; orientation to time, place, and person; and muscle tenderness. The notes indicated that Klarner and Dr. Aloise discussed her medications, back pain, and that her bipolar symptoms were increasing. The notations of Klarner's medical history indicated that she had an anxiety disorder, hypertension, fibromyalgia, hyperlipidemia, major depressive disorder, and tendonitis.

In November 2015, Klarner visited Dr. Olevia Metry with Family Medicine at Lee Memorial Hospital "to establish primary care." She complained of, among other things, back and shoulder pain and muscle spasms. The notes indicated that Klarner appeared well-developed and well-nourished, had normal range of motion, was oriented to time, place, and person, and was alert. Dr. Metry referred Klarner for pain management.

In a December 2015 visit with Dr. Aloise for an illness, Klarner also reported joint pain and depression. Again Dr. Aloise indicated that Klarner appeared well-developed and overweight with normal gait and ambulation; good judgment; normal mood and affect; proper orientation to time, place, and person; and normal short- and long-term memory. He did not note any muscle tenderness. An x-ray of Klarner's lumbar spine showed "mild degenerative changes at the L5/S1 level," but "[n]o acute abnormality or instability."

In March 2016, Klarner underwent a cervical MRI for "[n]eck pain following injury at work." The results showed (1) "posterior disc herniation impinging on the anterior thecal sac" and "mild spinal canal stenosis" at the C5/6 level, and (2) "disc space narrowing" and a "posterior disc bulge" at the C8/7 level. An MRI of the lumbar spine that same month related to the same unspecified injury at work showed disc herniation and disc bulging "with annular tear" at some levels of the lumbar spine. An MRI of the thoracic spine due to increasing "chronic midback pain" yielded normal results.

On April 2, 2016, Klarner visited the emergency room after a car accident. She was given pain medication and directed to follow-up with her primary care physician. On April 4, 2016, Klarner followed up with Dr. Metry complaining, among other things, of muscle spasms in her legs and back, chronic back pain, and neck pain following the accident. She was prescribed a muscle relaxer and pain medication. A few days later, Klarner saw Dr. Jeffery Johns, complaining of continued pain since the accident in her back, neck, and right hip. Dr. Johns's examination showed right hip tenderness and decreased range of motion in her cervical and lumbar back, as well as tenderness, pain, and spasm. Her mood and affect were normal. Dr. Johns diagnosed a muscle spasm of the back and prescribed pain medication. Klarner underwent a cervical MRI a few weeks later which revealed "disc and facet degeneration" that was "worst at C5-C6 and C6-C7," "minimal encroachment on the ventral thecal sac," and no spinal cord deformity or stenosis.[7]

Later in April 2016, Klarner saw Dr. Metry for IBS and anxiety. During this visit, Klarner asked for pain medication and clonazepam (an anxiety medication). Dr. Metry observed that Klarner's range of motion was normal and she exhibited no tenderness during the exam. Dr. Metry noted "there seems to be

---

[7] Medical records indicate that Klarner went to the emergency room again in July 2016 with lower back pain and indicated that she believed it was related to her injury from the car accident. The emergency room diagnosed her with a lumbar strain and gave her Tylenol and a prescription for steroids.

many prescribers connected to this [patient] and I do not see a need for some of these meds on her list and she states she will get them elsewhere."

Following her car accident, Klarner began seeing a chiropractor in April 2016 through February 2017. Those records documented Klarner's subjective complaints of difficulty sleeping due to chronic pain; limited ability to clean, lift, bend, or do "other activities involving raising or working with her arms"; inability to do even light exercise; "personal grooming, hygiene, and care have become almost unbearably painful"; difficulty engaging in "physical romance" due to pain. The chiropractor opined that the objective medical evidence supported muscle spasms, a loss of range of motion, and "disc involvement on MRI."

After her chiropractic treatment began, Klarner also began seeing Dr. Debra Roggow from October 2016 to May 2017 for her injuries related to the car accident. At the October 2016 encounter, Dr. Roggow found Klarner had a sprain and strain of the lumbosacral joint/ligament with "lumbar pain aggravated by pre-morbid scoliosis." Throughout her encounters with Dr. Roggow, Klarner's muscles in her extremities had normal strength and tone and her mental status and functioning was normal and her mood was stable.

In May 2017, Klarner visited Dr. Aloise for an illness and also complained of anxiety, depression, muscle aches and weakness, and joint and back pain. Dr. Aloise observed that Klarner had a healthy general appearance; normal mood; affect and memory;

good judgment; and was alert and oriented. He adjusted her medications.

In June 2017, Klarner underwent MRIs of her cervical spine and right shoulder. Those results revealed a "partial thickness cuff tear of" a tendon in her shoulder, "mild cervical spondylosis" and "mild dynamic subluxation at C3–4." In June 2017, Klarner also visited a pain management specialist for her headaches, back, shoulder, and neck pain, reporting a 4 out of 10 on the pain scale. That doctor noted that Klarner was "doing well on [her] opiate medications" and recommended continuing the current medications "as the patient's quality of life (QOL) and ability to perform [ADLs] are greatly improved with this medication regimen." Nearly identical findings were documented at her September and December 2017 visits, as well as her January and April 2018 visits.

In July 2018, Klarner visited Dr. Aloise to discuss medications and complained of muscle aches and weakness as well as joint and back pain. Dr. Aloise observed Klarner had a limited range of motion and muscle tenderness. She appeared healthy with normal memory and orientation, and good judgment. She was active and alert, but appeared depressed.

An August 2018 cervical spine MRI showed a "C6-7 asymmetric disc bulge to the left resulting in mild spinal canal stenosis and mild left foraminal stenosis, with slightly interval worsening from prior examination." At C5-6, there was also an "asymmetric disc bulge to the right."

In January 2019, Klarner again visited Dr. Aloise to discuss medications and complained of depression, muscle aches and weakness, and joint and back pain. Dr. Aloise's exam notes were generally consistent with the previous encounter, except Dr. Aloise did not note observing any signs of depression.

Klarner began seeing Dr. Trevor Cox as a new patient on September 24, 2019. She reported she had the following medical history: fibromyalgia, IBS, headaches, insomnia, right rotator cuff issues, scoliosis, osteoarthritis, bipolar disorder, and benzodiazepine dependence, but it was noted that all were well-controlled and stable, and that Klarner had an active lifestyle. She reported no back or neck pain, but she was experiencing depression, anxiety, irritability, and mood swings. Dr. Cox's physical exam revealed that Klarner had a normal appearance, full range of motion and no tenderness in her neck, good judgment, and normal mood, affect, and memory. In November 2019, Klarner visited Dr. Cox again to have him complete some paperwork. She indicated that her anxiety, bipolar, insomnia, and pain were "all well controlled/stable." On December 2, 2019, Dr. Cox completed a RFC form for Klarner. Dr. Cox indicated that Klarner could stand for only 30 minutes; sit for 20 to 30 minutes; walk 1 city block without stopping; and lift and carry 5 to 10 pounds during an 8-hour period and regularly/daily. He further stated that she needed to lie down to relieve back pain during the day; that she could not stand and/or sit upright for 6 to 8 hours because of her spinal stenosis and leg and back pain; that she could rarely reach above her shoulders, reach down to her waist level, reach down

towards the floor, carefully handle objects, and handle with her fingers; that her impairments prevented her from motions like lifting, pulling, and holding objects; and that she had difficulty bending, squatting, kneeling, and turning any part of her body. He opined that he did not believe that she could resume work or return to previous employment given her impairments, and that her disability was not likely to change.

At a visit with Dr. Cox in February 2020, Klarner again reported that her medical issues were stable and well-controlled. On April 20, 2021, Klarner again visited Dr. Cox for "continued care of chronic complaint(s)" of "arthritis; bipolar; hypertension; depression recurrent episode; neuropathy; [and] pain." She reported that these issues were "variably controlled" and that she had an "active lifestyle" and was "exercising regularly." She complained of muscle aches, back and joint pain, neck pain, depression, anxiety, and mood swings. However, Dr. Cox's physical exam revealed a full range of motion in her neck with no tenderness, a normal mood and affect, normal memory, and good judgment. She also requested that Dr. Cox complete paperwork for her disability application. Accordingly, Dr. Cox completed a 2021 medical source statement questionnaire for Klarner. He indicated that Klarner could lift less than ten pounds for one-third of the eight-hour workday due to her "lumbar" issues; stand and/or walk and sit for less than two hours per workday; climb, balance, stoop, bend, kneel, crouch, and crawl less than one-third of the workday; and reach in all directions, handle, and finger less than one-third of the workday with both hands. He opined that

she would need a 15-minute break every 30 minutes, and that she would need to lie down during the day to relieve pain for 2–4 hours at a time.

Additionally, he indicated that Klarner's bipolar disorder, anxiety, and major depression limited her concentration; ability to follow, carry out, remember, and understand simple instructions; ability to use judgment; respond to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting to less than 1/3 of the workday. He further indicated that she would be off task more than 60 percent of the day and would miss at least 3 days of work per month for appointments.

In April 2022, Klarner presented to the emergency department with neck pain associated with twisting from putting laundry away, and the pain radiated to her left shoulder, arm, forearm, and hand. The emergency room documented cervical back pain with movement, muscular tenderness, and decreased range of motion. The emergency room diagnosed her with radiculopathy (unspecified spinal region), as well as a strain of the neck muscle.

Turning to Klarner's psychiatric care records, she received regular treatment at SalusCare, Inc. At a visit in August 2015 visit Klarner indicated that she was "working 1-2 days a week delivering flowers." She reported having been in psychiatric care since 2000 when she was diagnosed with "manic-depression" (bipolar disorder) and had been on a number of psychiatric medications. At the time of the visit, she reported "racing thoughts, social isolation,

anhedonia, hopelessness, anxiety, helplessness," rapid mood swings, difficulty sleeping, "having 2 days of not sleeping and sexual promiscuity," and high-risk behavior. Her doctor observed that Klarner's personal hygiene appeared good, she had good judgment and insight, coherent and logical thoughts, an anxious but appropriate mood, no suicidal or homicidal ideation, proper orientation, normal speech, and was "polite and cooperative." Her doctor adjusted her medications. Similar observations about Klarner's appearance, affect, mood, and thoughts were noted at a follow-up visit in November 2015. At a December 2015 visit, she reported increased depression and fleeting thoughts of self-harm and poor sleep. At this visit, Klarner appeared neat and clean; had a normal fund of knowledge; good judgment and insight; coherent, logical, and goal-directed thoughts; proper orientation; normal but slow speech; and depressed mood. The doctor adjusted Klarner's medications.

At a follow-up visit in January 2016, Klarner reported continuing to struggle with depression and anxiety and indicated that she had recently spent eight days at an in-patient facility due to medication issues. They discussed adjusting her medications, and Klarner also reported that she recently obtained a job working in a casino 28 hours a week. The doctor made similar observations to prior visits regarding Klarner's appearance, mood, judgment, etc.

In February and May 2016, Klarner reported a stable mood and that she was experimenting with different medication

combinations on her own instead of taking them as prescribed. In February 2017, at a follow-up for medication management and refills, she reported "doing well," and indicated that she "work[ed] part time running errands for people." She again reported doing well in June, August, November, and December 2017, and continuing to work part time running errands for people. She reported the same in March and June 2018 and December 2019. Mental examinations during these periods were unremarkable.

In conjunction with Klarner's SSI application, Dr. Barbara Lewis, a state agency psychiatric consultant, opined that Klarner was not significantly limited in the following: (1) remembering locations and work-like procedures; (2) her ability to understand and remember short and simple instructions; (3) her ability to carry out those simple instructions; (4) her ability to sustain an ordinary routine without special supervision; (5) her ability to work in coordination with or in proximity to others without distraction; and (6) her ability to make simple work related decisions. However, Dr. Lewis opined that Klarner "would have difficulty with detailed instructions" and was moderately limited in her ability to understand and remember detailed instructions. Dr. Lewis further opined that Klarner was moderately limited in her ability to maintain attention and concentration for extended periods, her ability maintaining a regular schedule, and might "experience occasional interruptions from psychologically based symptoms."

Similarly, another state agency consultant, Dr. John Thibodeau, opined that Klarner was moderately limited in her ability to understand, remember, and carry out detailed instructions, but that she could understand, remember, and carry out simple instructions. He also opined that she was moderately limited in her ability to maintain attention and concentration for extended periods of time.[8]

Between 2020 and the June 2022 evidentiary hearing, Klarner occasionally reported an increase in her mental health symptoms, and she was briefly admitted to an in-patient psychiatric care facility for depression in February 2022. As of March and April 2022, her overall mood had improved but she still struggled with anxiety and impaired attention, insight, and judgment. However, her memory, intelligence, and fund of knowledge were normal.

## D. The ALJ's Decision

Following testimony from Klarner and the VE, the ALJ explained that he assessed whether Klarner established a disability as of September 1, 2014—the earlier onset date listed in her SSI application—for both her 2017 SSI claim and her 2020 DIB claim. The ALJ then explained that (consistent with Klarner's request) he was not reopening her previously denied 2015 DIB claim. Relatedly, the ALJ explained that, under the Social Security rules and regulations, the denial of the 2015 DIB claim did not operate

---

[8] The record contains opinions from other state agency consultants as well as opinions from consultants on Klarner's physical limitations, but we discuss only the ones that are relevant to the issues raised in this appeal.

as *res judicata* for Klarner's 2020 DIB claim (even though both claims alleged a disability for the same time period) because of a change in the law related to the SSA's "musculoskeletal listings."

Employing the SSA's five-step sequential evaluation process for determining whether a claimant is disabled,[9] the ALJ found that Klarner was not disabled from September 1, 2014, through the date of the decision July 18, 2022.[10] The ALJ found that Klarner had not engaged in substantial gainful employment since September 1, 2014,[11] and that Klarner had several severe impairments, including: degenerative disc disease of the cervical and lumbar spine; thoracic dextroscoliosis; partial thickness tear in her right shoulder; tear of the left shoulder; osteoarthritis; carpal tunnel syndrome; headaches; bipolar disorder; anxiety; and depression. However, he found that none of Klarner's impairments individually or in

---

[9] The determination process involves the following five steps: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether she "has a severe impairment or combination of impairments"; (3) if so, whether that impairment, or combination of impairments, meets or equals the medical listings in the regulations; (4) if not, whether the claimant can perform her past relevant work in light of her RFC; and (5) if not, whether, based on the claimant's age, education, and work experience, she can perform other work found in the national economy. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011).

[10] For Klarner's DIB claim, she had to establish a disability prior to her date last insured March 31, 2016. That time limitation did not apply to her SSI claim.

[11] The ALJ noted that Klarner had engaged in some work activity after September 1, 2014, but her earnings records did not "indicate her having wages above substantial gainful activity levels."

combination met or equaled a listed impairment in the Social Security regulations' Listing of Impairments that would trigger an automatic finding of disability.

Thus, the ALJ concluded that, after considering the entire record, Klarner had an RFC for light work with certain physical limitations related to her ability to lift and carry, sitting, standing and walking, pushing and pulling, climbing, bending, kneeling, and crouching. The ALJ also found as part of the RFC that Klarner was limited to being "able to understand, remember, and carry out simple tasks while maintaining attention and concentration for two hours at a time before requiring a regular scheduled break" and low stress work.

The ALJ found that Klarner's impairments "could reasonably be expected to cause the alleged symptoms," but that Klarner's "statements concerning the intensity, persistence and limiting effects of these symptoms [were] not entirely consistent with the medical evidence and other evidence in the record for reasons explained in this decision." For instance, the ALJ noted that Klarner's "extreme allegations of debilitating physical limitations" were inconsistent with her treatment records which showed a normal gait, that she walked without an assistive device, and that she never had surgery on her spine. With regard to her mental health, the ALJ noted that Klarner's treatment notes consistently reflected that she was "oriented, [had] good judgment and insight; and [had] coherent, logical, and goal-directed thought" and did not struggle with ADLs.

The ALJ then discussed the medical evidence at length regarding Klarner's physical impairments and mental impairments. The ALJ explained that he gave "significant weight" to the opinions of the state agency psychiatric consultants, Drs. Lewis and Thibodeau, who opined that Klarner was "capable of performing simple, routine, and repetitive tasks," as their opinions were well supported by Klarner's psychiatric care treatment notes.

The ALJ explained that he had considered the medical statements from Dr. Cox who opined that Klarner was limited to a reduced range of sedentary activities. However, the ALJ concluded that Dr. Cox's "extreme opinions [were] highly inconsistent with [his] physical examinations" and treatment notes, as well as the imaging results. Additionally, Dr. Cox's statements regarding Klarner's limitations were inconsistent with her own self-reported activities that included "shopping, doing laundry, driving, and part time work." Moreover, the ALJ noted that, with regard to the DIB claim, Dr. Cox did not begin seeing Klarner until 2019, well after her date last insured of March 31, 2016.

The ALJ found that Klarner was unable to perform any past relevant work, but that she could perform jobs as a marker, checker I, and router, "[a]ny one of [which]" existed in significant numbers in the national economy based on the VE's testimony. All three jobs involved level two reasoning. As such, the ALJ concluded that Klarner was not disabled from September 1, 2014, through the date of the decision. Accordingly, the ALJ denied both Klarner's SSI application and the DIB application.

Thereafter, Klarner, through counsel, requested Appeals Council review.  In support, she submitted a memorandum arguing, in relevant part, that the VE's testimony was inconsistent with the "Job Browser Pro" data.  Specifically, Klarner, for the first time, presented data she pulled from "Job Browser Pro" that indicated that there were fewer jobs available in the national economy in the positions of marker, router, and checker I than the VE's testimony indicated.[12]  The Appeals Council denied Klarner's request for review.

### E.  District Court Proceedings

Klarner then filed a complaint in the district court arguing that: (1) that the ALJ's decision was "legally insufficient and unsupported by substantial evidence" because the ALJ relied on the VE's testimony about the number of jobs available in the national economy, but the data reveals there are less numbers available; (2) the ALJ failed to develop a full and fair record because the ALJ failed to associate all of the evidence from Klarner's first DIB application with the new file; (3) the ALJ failed to identify good cause for discounting the opinions of her treating physician, Dr. Cox; and (4) the RFC determination was not supported by substantial evidence because it failed to include a limitation on detailed instructions, despite crediting the opinions of the state agency psychological consultants who identified this limitation.

---

[12] For instance, according to Klarner's memo, in the national economy there were only 136,785 marker jobs, 25,152 router jobs, and 4,604 checker I jobs.

The magistrate judge affirmed the agency's decision.[13]   Klarner timely appealed.

## II.    Standard of Review

"When, as in this case, the ALJ denies benefits and the [Appeals Council] denies review, we review the ALJ's decision as the Commissioner's final decision." *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001).  "Our review of the Commissioner's decision is limited to whether substantial evidence supports the decision and whether the correct legal standards were applied." *Walker v. Soc. Sec. Admin., Comm'r*, 987 F.3d 1333, 1338 (11th Cir. 2021); *see also Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005) ("[W]e review *de novo* the legal principles upon which the Commissioner's decision is based," and "we review the resulting decision only to determine whether it is supported by substantial evidence.").

"Substantial evidence is less than a preponderance, and thus we must affirm an ALJ's decision even in cases where a greater portion of the record seems to weigh against it." *Simon v. Comm'r, Soc. Sec. Admin.*, 7 F.4th 1094, 1103 (11th Cir. 2021) (quotation omitted); *see also Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir. 2004) ("Substantial evidence is more than a scintilla and is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." (quotations omitted)).  "We may not decide the facts anew, reweigh the evidence, or substitute

---

[13] Both parties consented to the magistrate judge's presiding over and issuing a final decision in this case.

our judgment for that of the [Commissioner]." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011) (alteration in original) (quotation omitted). "Even if the evidence preponderates against the Commissioner's findings, we must affirm if the decision reached is supported by substantial evidence." *Crawford*, 363 F.3d at 1158–59 (quotation omitted).

## III.    Discussion

Klarner argues that (1) the VE's testimony did not provide substantial evidence to support the ALJ's decision because his testimony about the number of jobs available in the national economy was inaccurate; (2) the ALJ failed to fully and fairly develop the record; (3) the ALJ failed to provide good cause for rejecting Dr. Cox's opinion; and (4) the RFC determination is not supported by substantial evidence because the ALJ omitted one of Klarner's mental limitations from the RFC, despite giving great weight to the opinions of the state agency consultants who found that limitation existed.[14] We address each argument in turn.

### A.  The VE's Testimony Concerning Available Jobs in the National Economy

Klarner argues that the VE's testimony did not provide substantial evidence to support the ALJ's decision because the VE's

---

[14] To the extent Klarner also argues that the district court committed several errors in its analysis of her claims, we do not address these arguments because we are tasked with reviewing the Commissioner's decision, not the district court's. *See Henry v. Comm'r of Soc. Sec.*, 802 F.3d 1264, 1267 (11th Cir. 2015) ("Our review is the same as that of the district court, meaning we neither defer

testimony about the number of jobs available in the national economy was inaccurate and unreliable. She acknowledges that she never made this argument before the ALJ, but points out that she presented the new evidence of the job data to the Appeals Council, and she maintains that we must consider this new evidence.

Klarner is correct that she was allowed to present new evidence to the Appeals Council, and the Appeals Council must consider this evidence in making its decision. *Washington v. Soc. Sec. Admin., Comm'r*, 806 F.3d 1317, 1320 (11th Cir. 2015). But when, as here, the Appeals Council denied review and Klarner does not challenge that decision, "we will look only to the evidence actually presented to the ALJ in determining whether the ALJ's decision is supported by substantial evidence." *Falge v. Apfel*, 150 F.3d 1320, 1323–24 (11th Cir. 1998); *see also Ingram v. Comm'r of Soc. Sec. Admin.*, 496 F.3d 1253, 1266 (11th Cir. 2007) ("We understand *Falge* to hold that when a claimant challenges the administrative law judge's decision to deny benefits, but not the decision of the Appeals Council to deny review of the administrative law judge, we need not consider evidence submitted to the Appeals Council."). Accordingly, we do not consider the new Job Source Pro data that Klarner submitted for the first time to the Appeals Council. *Falge*, 150 F.3d at 1323–24.

---

to nor consider any errors in the district court's opinion." (quotations and citation omitted)).

"[T]he critical inquiry at step five [of the ALJ's evaluation process] is whether jobs exist in the national economy in significant numbers that the claimant could perform in spite of [her] impairments." *Washington v. Comm'r of Soc. Sec.*, 906 F.3d 1353, 1360 (11th Cir. 2018). In making this inquiry, the ALJ "does not tally the number of job openings at a given time, but rather approximates the number of positions that exist, whether vacant or filled, and without regard to the location of the work and a claimant's likelihood of being hired." *Goode v. Comm'r of Soc. Sec.*, 966 F.3d 1277, 1281 (11th Cir. 2020) (quotations omitted). To estimate the number of available jobs, the ALJ often relies on the testimony of a VE: a professional with experience in job placement and knowledge of working conditions. *See Biestek v. Berryhill*, 587 U.S. 97, 100 (2019). The testimony of a VE "may count as substantial evidence even when unaccompanied by supporting data." *Id.* at 105. Moreover, "the Social Security Act and its regulations do not mandate a precise count of job numbers." *Goode*, 966 F.3d at 1284. Rather, we have simply held that "when an ALJ . . . relies on the testimony of a [VE] for the number of jobs in the national and regional economies that a claimant could perform, that testimony cannot be both internally inconsistent and incomplete." *Id.* at 1284–85. Finally, an ALJ has an affirmative duty to identify any "apparent" conflict between the Dictionary of Occupational Titles ("DOT") and VE testimony and resolve it. *Washington*, 906 F.3d at 1362. A conflict is "apparent" if it "is reasonably ascertainable or evident from a review of the DOT and the VE's testimony." *Id.* at 1365.

The ALJ here reasonably relied on the VE's testimony regarding the number of jobs in the national economy. Klarner does not argue that there was a conflict between DOT and the VE's testimony. Thus, the ALJ's affirmative duty to resolve an "apparent" conflict was not triggered. *Id.* With regard to the VE's job number estimates, there was no evidence before the ALJ suggesting that the VE's estimates were flawed, and the VE's testimony went unchallenged before the ALJ in this regard. Accordingly, we conclude that the ALJ was entitled to rely on the VE's testimony, the VE's testimony was not internally inconsistent or incomplete, and that testimony constituted substantial evidence to support the determination that there were a significant number of jobs in the national economy that Klarner could perform despite her impairments. *Biestek*, 587 U.S. at 105; *Goode*, 966 F.3d at 1284–85.

## B.  *Development of the Record*

Next, Klarner argues that the ALJ has a duty to develop the record in a Social Security case, and the ALJ failed to fully and fairly develop the record because he failed to "associate" evidence from Klarner's prior 2015 DIB claim with her present claim. She maintains that her prior 2015 DIB claim file contained important evidence from three state agency doctors—Dr. Johnson, Dr. Mihm, Dr. Bowman, and Dr. Hodes, and contained a 2015 medical opinion from Dr. Aloise, all of which would have shed light on whether Klarner was disabled from September 1, 2014, to July 18, 2022. She acknowledges that her representative at the hearing on

the new claims affirmatively stated that he had reviewed her current file and there was no outstanding evidence. Nevertheless, she argues that the statement does not matter because the ALJ had an "investigatory duty" under the SSA's Hearings, Appeals, and Litigation Law Manual ("HALLEX")[15] to develop the record and consider information from her prior claim.

"It is well-established that the ALJ has a basic duty to develop a full and fair record" in disability proceedings. *Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003); *Cowart v. Schweiker*, 662 F.2d 731, 735 (11th Cir. 1981) ("Because a hearing before an ALJ is not an adversary proceeding, the ALJ has a basic obligation to develop a full and fair record."). This duty applies regardless of whether the applicant is represented. *Brown v. Shalala*, 44 F.3d 931, 935 (11th Cir. 1995) ("Whether or not the applicant is represented, the ALJ still has a duty to develop a full and fair record.").

"Nevertheless, the claimant bears the burden of proving that [she] is disabled, and, consequently, [she] is responsible for producing evidence in support of [her] claim." *Ellison*, 355 F.3d at 1276; *see also* 20 C.F.R. § 416.912(a) (defining the claimant's responsibilities and stating "[y]ou must inform us about or submit all evidence known to you that relates to whether or not you are blind or disabled. This duty is ongoing and requires you to disclose any additional related evidence about which you become aware."); *see also* 20 C.F.R. § 416.912(b)(1) (explaining that, before making a

---

[15] *See* Social Security Administration, *HALLEX: Hearings, Appeals, and Litigation Law Manual*, *available at* https://perma.cc/NJ7P-8DKC.

30                    Opinion of the Court                    24-11613

disability determination, the SSA "will develop your complete medical history for at least the 12 months preceding the month in which you file your application unless there is a reason to believe that development of an earlier period is necessary" and to further said development of the record "[w]e will make every reasonable effort *to help you get medical evidence* from your own medical sources and entities that maintain your medical sources' evidence when you give us permission to request the reports" (emphasis added)).[16] Thus, Klarner bore the burden of producing evidence in support of her claim, and if she believed that records from the prior 2015 DIB claim were relevant she had an obligation to bring them to the ALJ's attention. But she did not. Rather, her representative affirmatively stated at the hearing that Klarner did not want to reopen the 2015 DIB claim, which would have necessarily led to

---

[16] Contrary to Klarner's position, nothing in the agency's HALLEX requires an ALJ to make a prior claim file part of the record. Rather, even assuming arguendo that the provisions in HALLEX are binding and carry the force of law, the provisions upon which Klarner relies merely provide that the Office of Hearing Operations ("OHO") staff must determine whether a claimant has a prior file and must consult with the ALJ to determine whether the evidence from the prior claim file is necessary for a full adjudication of the issues. *See Hallex HA* 01210.013, *available at* https://perma.cc/K34M-FFZZ. The procedures make clear that, where a prior claim file is not being reopened and is not serving as *res judicata*, it is within the ALJ's discretion to determine whether the prior claim file is needed. *Id*. Similarly, while Klarner is correct that relevant evidence must be exhibited under HALLEX, nothing in the provision on which she relies mandates that a prior claim file be exhibited. *See Hallex HA* 01210.015, *available at* https://perma.cc/NG6T-CPNM.

24-11613                Opinion of the Court                31

the ALJ considering all of the evidence submitted as part of the 2015 claim. Moreover, her representative stated twice that he had reviewed the present claims file and there was no outstanding evidence that needed to be considered. Consequently, at best, any alleged error was invited. *See Ford ex rel. Est. of Ford v. Garcia*, 289 F.3d 1283, 1293–94 (11th Cir. 2002) ("It is a cardinal rule of appellate review that a party may not challenge as error a ruling or other trial proceeding invited by that party." (quotation omitted)).

Regardless, even setting aside the invited error, "there must be a showing of prejudice before we will find that the claimant's right to due process has been violated to such a degree that the case must be remanded to the Secretary for further development of the record." *Brown*, 44 F.3d at 935. In assessing whether such prejudice exists, "[t]he court should be guided by whether the record reveals evidentiary gaps which result in unfairness or clear prejudice." *Graham v. Apfel*, 129 F.3d 1420, 1423 (11th Cir. 1997) (quotations omitted).

Klarner makes no attempt to explain in her briefing why the omissions of the opinions of the state agency consultants—Drs. Bowman, Mihm, Hodes, and Johnson—in her prior 2015 DIB claim resulted in prejudice. With regard to Dr. Aloise's 2015 opinion, she argues that the omission of this evidence was prejudicial because Dr. Aloise was a treating physician,[17] and he identified more

---

[17] SSA regulations in force at the time Klarner filed her March 14, 2017, SSI application required an ALJ to give "controlling weight" to a treating physician's opinion if it was "well-supported by medically acceptable clinical

significant limitations than those found in the RFC, including that Klarner needs to frequently lie down, that she could not lift more than 5 pounds, and that she is much more limited in her sitting and standing abilities. But Klarner's allegation of prejudice is undermined by the fact that, despite Dr. Aloise's more restrictive opinion, her 2015 DIB claim was still denied based on a finding of no disability.[18] And her assertion that she would have necessarily benefited from this opinion in the adjudication of her 2017 SSI claim and 2020 DIB claim is pure speculation.

Furthermore, despite the omission of Dr. Aloise's 2015 opinion from this record, we conclude that the record was more than sufficient for the ALJ to evaluate Klarner's impairments and RFC. The record included hundreds of pages of medical records spanning eight years, which the ALJ painstakingly reviewed as demonstrated by the thorough thirty-three-page opinion from the

---

and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). The SSA has since amended its regulations and removed the "controlling weight" requirement for all applications filed after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 404.1520c. The SSA's Program Operations Manual System ("POMS") provides that when, as here, there are multiple open claims—Klarner's 2017 SSI claim and her 2020 DIB claim—the SSA "use[s] the earliest possible filing date of the claims," which means that the rules for claims filed prior to March 27, 2017, applied in Klarner's case. *See* POMS DI 24503.050(D)(2)(a), *available at* https://perma.cc/J6Y9-GTZJ.

[18] Indeed, the prior ALJ presiding over the 2015 DIB claim rejected Dr. Aloise's opinion after concluding that his assessment was "overly restrictive and inconsistent with the record as a whole."

ALJ. While this evidence may not have included Dr. Aloise's formal 2015 opinion regarding Klarner's physical limitations, it included numerous medical records and treatment notes from Dr. Aloise, which the ALJ considered. Accordingly, the record "does not show the kind of gaps in the evidence necessary to demonstrate prejudice." *Graham*, 129 F.3d at 1423. Consequently, Klarner is not entitled to relief.

### C. Dr. Cox's Opinion

Next, Klarner argues that the ALJ failed to provide good cause for rejecting Dr. Cox's opinion. She maintains that Dr. Cox's opinion is entitled to controlling weight and is consistent with the evidence in the record.

When making a disability determination, the ALJ must give special attention to medical opinions, particularly those of the treating physician. At the time of Klarner's applications, a treating physician's opinion was entitled to "controlling weight" if it was "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(c)(2). Good cause to discount a treating physician's opinion exists "when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Winschel*, 631 F.3d at 1179 (quotation omitted). "[T]he ALJ must state with particularity the weight given to different medical opinions and the

reasons therefor." *Id.* There are no magic words to state with particularity the weight given to the medical opinions. Rather, the ALJ must "state with at least some measure of clarity the grounds for his decision." *Id.* (quotation omitted). "We will not second guess the ALJ about the weight the treating physician's opinion deserves so long as [the ALJ] articulates a specific justification for it." *Hunter v. Soc. Sec. Admin., Comm'r*, 808 F.3d 818, 823 (11th Cir. 2015).

In this case, the ALJ provided good cause for not giving controlling weight to the opinions of Dr. Cox. For instance, the ALJ explained that he discounted Dr. Cox's medical opinions as to Klarner's alleged significant limitations because Dr. Cox's opinions were not supported by his own treatment notes, the imaging results in the record, or Klarner's own reports of daily activity. The ALJ's statement is supported by the collective medical evidence. For instance, in December 2019, Dr. Cox completed a medical statement for Klarner and opined that she could only stand for 30 minutes and sit for 20 to 30 minutes and that she could rarely reach up or down or handle objects due to her spinal issues and back and leg pain, but around that same time period Klarner was working part-time test driving cars. Furthermore, Dr. Cox's own treatment notes from this time period reflect that Klarner reported that her medical issues were well-controlled and stable, and that she had an "active lifestyle." Additionally, Dr. Cox's physical exams revealed a normal gait and stance and full range of motion in Klarner's cervical spine with no tenderness noted. Moreover, Dr. Cox's medical opinions were inconsistent with the other objective

medical evidence in the record such as the imaging studies of Klarner's spine and shoulders and the treatment notes from her other doctors. Accordingly, the ALJ provided specific justifications for giving less than controlling weight to Dr. Cox's opinions. Thus, the ALJ satisfied the good cause standard, and we will not second guess the ALJ's decision. *See id.*

### D. *The RFC Determination*

Finally, Klarner argues that the ALJ omitted one of Klarner's mental limitations from the RFC—that she would have difficulty with detailed instructions—despite giving significant weight to the opinions of Dr. Lewis and Dr. Thibodeau who found that limitation existed. Accordingly, she argues that the RFC determination is not supported by substantial evidence because all three jobs the ALJ found she could perform in the national economy require a reasoning level of two, which requires the ability to perform detailed tasks.

Disability is defined as an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The impairment must be "of such severity that [the person] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . ." *Id.* § 423(d)(2)(A).

The RFC represents the most that a claimant can do despite her limitations or restrictions. *See* 20 C.F.R. § 404.1545(a)(1). The task of determining a claimant's RFC and ability to work is solely within the province of the ALJ based on all the evidence, not the claimant's doctors or the state agency consultants. *See* 20 C.F.R. § 404.1546(c) ("[T]he administrative law judge or the administrative appeals judge at the Appeals Council (when the Appeals Council makes a decision) is responsible for assessing your residual functional capacity."); *see also id.* § 404.1527(d)(2) ("Although we consider opinions from medical sources on issues such as . . . your residual functional capacity (*see* §§ 404.1545 and 404.1546), . . . the final responsibility for deciding these issues is reserved to the Commissioner.").

Here, substantial evidence supports the ALJ's RFC finding. Although the RFC determination did not specifically include a detailed instruction limitation, it limited Klarner to "low stress work" that involved "understand[ing], remember[ing], and carry[ing] out simple tasks while maintaining attention and concentration for two hours at a time before requiring a regular scheduled break." This limitation is entirely consistent with the opinions of Drs. Lewis and Thibodeau that Klarner could understand, remember, and carry out simple instructions.[19]

---

[19] Klarner argues that the ALJ's error in assessing her RFC determination is clear based on our unpublished decision in *Weidlich v. Commissioner of Social Security*, no. 22-13309, 2023 WL 8015753 (11th Cir. 2023). We disagree. First, *Weidlich* is an unpublished decision and therefore is not binding on us. *Ray v. McCullough Payne & Haan, LLC*, 838 F.3d 1107, 1109 (11th Cir. 2016) ("In this

Klarner argues that her difficulty with detailed instructions prevents her from performing level two reasoning work. However, she does not dispute that she is capable of understanding, remembering, and following simple instructions as the ALJ found, and we have previously held that there is no apparent conflict between a limitation of "understand[ing], carry[ing]-out, and remember[ing] simple instructions" and jobs requiring a reasoning level of two. *Buckwalter v. Acting Comm'r of Soc. Sec.*, 5 F.4th 1315,1323–24 (11th Cir. 2021). We explained that, although level two reasoning was defined as the ability to "[a]pply commonsense understanding to carry out detailed but uninvolved written or oral instructions," the reference to "detailed" referred to "the *length* of the instructions—not the complexity." *Id.* at 1323 (emphasis in original). Thus, there was no conflict between an

Court, unpublished decisions, with or without opinion, are not precedential and they bind no one."). Second, even if we were to find *Weidlich* persuasive, Klarner's case is distinguishable. In *Weidlich*, the ALJ found the opinion of the claimant's physician—that the claimant "could infrequently lift up to ten pounds, occasionally lift up to five pounds, and never lift more than ten pounds"—"generally persuasive," and the ALJ noted the need for even greater limitations due to ongoing issues with the claimant's arm and neck. *Weidlich*, 2023 WL 8015753, at *2. Yet, the ALJ made an RFC determination that the claimant could perform "light work, which involves lifting up to 20 pounds." *Id.* (quotations omitted). Due to the contradiction between the RFC determination and the medical evidence and the lack of any explanation for the difference, we concluded that substantial evidence did not support the ALJ's decision. *Id.* at *2–3. Here, however, as explained above there is no inconsistency. The ALJ's RFC determination tracks Dr. Lewis's and Dr. Thibodeau's findings.

RFC finding that limits a  claimant to understanding and carrying out simple instructions and jobs requiring level two reasoning. *Id.* at 1323–24.

### IV.    Conclusion

For the above reasons, we affirm.

**AFFIRMED.**